GRAFEMAN DAIRY COMPANY, Appellant, v. NORTHWESTERN BANK et al.

In Banc, November 30, 1921.

1. **CONVEYANCE: By Corporation: Unauthorized by Directors.** A deed of trust given to secure a collateral note of even date, signed by a corporation by its president and attested by the signature

of its secretary and the seal of the corporation, and duly acknowledged by its president, the certificate stating that it was signed and sealed by the authority of its board of directors, whereby the company's office, plant and place of business was conveyed to a trustee as security for the payment of the note, but in fact not authorized by its board of directors, of whom there were five, two of whom were the president and secretary, is not a valid conveyance, and does not bind the corporation, although the president was the principal stockholder and no meeting of the directors or stockholders had been held for years. Corporate acts, such as the conveyance of lands, to be valid, must have the sanction and be authorized by the board of directors.

2. ——:——:——: **Statutory Acknowledgment.** The Legislature recognized that corporate acts are to be authorized by the board of directors in the statute (Sec. 2188, R. S. 1919) in which the form of acknowledgment of a corporation was suggested, to contain the sworn statement of its president or other chief officer that the "instrument was signed and sealed in behalf of said corporation;" and while such suggested form is merely directory, it conclusively implies that, in the legislative mind, the authority of the board of directors was an element of all corporate conveyances of land, and such implication is in harmony with the general law that, independent of statute, the authorization by the board of directors is necessary to the validity of a corporate mortgage attempted to be executed by its president upon its going plant as security for borrowed money.

3. ——: ——: ——: **Equitable Estoppel.** Equitable estoppel cannot be interposed to defeat a recovery upon the legal title unless it is pleaded; and where the evidence establishes that the execution of the corporate mortgage, regular on its face, was not authorized by its board of directors and was therefore void, it devolves upon the holder of the note, when sued by the corporation to have said mortgage removed as a cloud upon its title, to plead and prove any equitable defense it desires to assert in derogation of the legal title. But although said holder stands solely upon the legal title acquired by the mortgage, the court will examine the plaintiff corporation's own evidence to ascertain whether it shows that the plaintiff is estopped, in equity, although equitable estoppel is not pleaded, from asserting the invalidity of the mortgage and to have it removed as a cloud upon its title.

4. ——: ——: ——: ——: **Knowledge of Transaction: Personal Debt of President.** Where the most of the debt to the bank, to secure which the president of a corporation executed a deed of trust, without authority from its board of directors, was long past

Grafeman Dairy Co. v. Northwestern Bank.

due, and the remainder was created for the purpose of procuring the deed of trust regardless of the power of the board of directors to execute it, and the evidence tends strongly to show that the mortgage was given and received under an arrangement between the president and the bank to secure the personal indebtedness of the president and not the debts to the bank of the corporation, a judgment refusing to remove said deed of trust upon the title of the corporation's properties and holding that said plaintiff corporation is estopped to demand said relief on the ground that it owed the money to the bank and through its president executed a deed of trust regular on its face to secure it, will not be upheld.

5. ——: ——: ——: Ratification. The president of a corporation who executes a deed of trust on its properties to secure the payment of borrowed money, invalid because he was not authorized by its board of directors to execute it, cannot, by receiving and retaining the money in his capacity as manager of the business of the corporation, although he has been permitted by the directors and stockholders to exercise autocratic powers over its business, ratify said invalid deed of trust, and thereby estop the corporation to deny the validity of the security upon which the money was procured.

6. ——: ——: Evidence: Admissions: Mortgage to Secure Personal Debt. Admissions made by the president of the corporation that certain indebtedness to defendant bank, claimed to be the debt of the corporation, was his personal debt, is admissible in evidence in an equitable suit to enjoin the foreclosure of a deed of trust executed by the president of the corporation, although said admissions were made long after the deed was executed and to a public accountant who was auditing the corporation's books at the request of the bank. And likewise evidence showing that the proceeds of a loan to the corporation were absorbed by its president is admissible where the question whether it ought to be made a condition of cancelling the invalid deed of trust that the corporation repay the money defendant claims it received upon such security, on the ground that it was estopped in equity to deny the sufficiency of the deed while retaining its benefits.

Appeal from St. Louis City Circuit Court.—*Hon. Victor H. Falkenhainer*, Judge.

Reversed and remanded.

*Jeffries* and *Corum* for appellants.

(1)   A mortgage by a corporation must be author-
ized by its board of directors.   Fletcher's Cyc. Corp.,
sec. 1299, p. 2274; Union National Bank v. State Nat.
Bank, 155 Mo. 95; Leggett v. New Jersey Mfg. & Bank-
ing Co., 1 N. J. Eq. 541; Gashwiler v. Willis, 33 Cal. 11,
20; State ex rel. Grimm v. Manhattan Rubber Co., 149
Mo. 181; McKeag v. Collins, 87 Mó. 164; State ex rel.
Schroeder v. Perkins, 90 Mo. App. 603; Frederick v.
Lettney, 214 Mass. 46; El Fresnal Irrigating Land Co.
v. Bank of Washington, 182 S. W. (Tex. Civ. App.)
703; Temple v. Dodge, 89 Tex. 68, 32 S. W. 514, 33 S. W.
222; Citizens Security Co. v. Hammel, 112 Pac. 731, 14
Cal. App. 564; In re St. Helen Mill Co., 3 Sawy. 88;
Alta Silver Mining Co. v. Alta Placer Mining Co., 78
Cal. 629.   (2)   A corporation is not liable for acts with-
in the apparent authority of its officers or agents where
the person dealing with such officers or agents has no-
tice of facts sufficient to put him on inquiry as to the
latter's authority.   Fletcher Cyc. Corp., sec. 1928; Louisi-
ana State Bank v. Orleans Navigation Co., 3 La. Ann.
294; Western Railroad v. Bayne, 11 Hun, 166; Kelsey v.
New England Railroad Co., 60 N. J. Eq. 230; Continental
Insurance Co. v. Schulman, 205 S. W. 315; Franco-Texas
Land Co. v. McCormick, 85 Tex. 416, 422; Stanley v.
Franco-American Ferment Co., 97 N. Y. Misc. 401; Bank
of Commerce v. Mining Co., 13 N. Mex. 424, 429.   (3)
Declarations made by William Grafeman, deceased,
against his pecuniary interest were admissible in evi-
dance.   Jones on Evidence, p. 405; Friberg v. Donovan,
23 Ill. App. 58; Wynn et al. v. Cory, 48 Mo. 346, 348; 22
C. J. 231, 232, 233.   (4)   There is no estoppel against
plaintiff.   (a)   Where estoppel is relied upon, it must
be specially pleaded.   Bray v. Marshall, 75 Mo. 327;
Noble v. Blount, 77 Mo. 235; Tyler v. Tyler, 78 Mo. App.
240; Hunt v. Searcy, 167 Mo. 158; Golden v. Tyler, 180
Mo. 196; Rieschick v. Klingelhoefer, 91 Mo. App. 430;
Western R. R. Co. v. Musser, 97 Mo. App. 114; Carthage

v. Light Co., 97 Mo. App. 20; Chance v. Jennings, 159 Mo. 544; Sanders v. Chartrand, 158 Mo. 352; Osborne v. Court of Honor, 152 Mo. App. 652; Babler Lbr. Co. v. Muhlbach, 109 Mo. App. 646; Turner v. Edmonston, 210 Mo. 411; Swainhart v. St. Louis Suburban Railroad, 207 Mo. 423; Union Biscuit Co. v. Springfield Gro. Co., 143 Mo. App. 300; Gulf Red Cedar Co. v. Crenshaw, 169 Ala. 606; McQueen v. Bank of Edgemont, 20 S. D. 378; Sutton v. Consolidated Apex Mining Co., 15 S. D. 410, 89 N. W. 1020.  (b)  In order to create an estoppel the person relying upon the estoppel must have been misled into such action that he would suffer injury if an estoppel be not declared.  Barnett v. Kamp, 258 Mo. 139, 157; Ford v. Fellows, 34 Mo. App. 630, 633; Rogers v. Marsh, 73 Mo. 64; Noble v. Blount, 77 Mo. 235; Spurlock v. Sproule, 72 Mo. 503; Rosencranz v. Swofford Dry Goods Co., 175 Mo. 518; Conrad v. Fisher, 37 Mo. App. 352; Eitelgeorge v. Building Assn., 69 Mo. 52; Acton v. Dooley, 74 Mo. 63; Hydraulic Press Brick Co. v. Newmeister, 15 Mo. App. 592; Garesche v. Levering Inv. Co., 146 Mo. 436.

*Geo. W. Lubke, Geo. W. Lubke, Jr.,* and *Walther, Muench & Hecker* for respondents.

(1)  The president of a business corporation, who has full control and management of its affairs, and who, without objection on the part of the board of directors, borrows money, pays dividends and buys real and personal property for the corporation, has implied authority to execute and deliver a deed of trust conveying its real estate as security for money borrowed for and received by the corporation.  P. R. Sinclair Coal Co. v. Missouri Hydraulic Mining Co., 207 S. W. 266; Strother v. Barrow, 246 Mo. 241; Tyler Estate v. Hoffmann, 146 Mo. App. 520; Danglade Co. v. Land Co., 190 S. W. 35. And even though he had no authority to execute a deed of trust to secure the payment of money borrowed for the corporation, if the corporation retains the money received by it through his unauthorized act, it fully

ratifies the same and cannot repudiate the deed of trust. Mining Co. v. Taylor, 247 Mo. 1; Smith v. Richardson, 77 Mo. App., 430; Campbell v. Pope, 96 Mo., 472; Chouteau v. Allen, 70 Mo. 290; Darst v. Gale, 83 Ill. 136; Love v. Metropolitan Church Assn., 184 Ill. App. 102; Doerr v. Fandango Lumber Co., 31 Cal. 318; Shafer v. Spruks, 225 Fed. 480; Weathersby v. Lumber Co., 107 Tex. 474; Clark v. Elmendorf, 78 S. W. (Tex.) 538; Bank v. Clark, 138 Ga. 798; Witter v. Grand Rapids Flouring Mill Co., 78 Wis. 543; Bullen v. Milwaukee Co., 109 Wis. 41; Chestnut Co. v. Record Pub. Co., 227 Pa. St. 235; Sherman v. Morris, 43 Kan. 282; Henry v. Colorado & C. Co., 10 Colo. App. 14; Cook on Corporations, pp. 2489; Jones on Mortgages, secs. 124, 127; Annotation to Weathersby v. Lumber Co., 7 A. L. R. 1446, 1477. (2) The declarations of William Grafeman, excluded by the court made in the absence of the representatives of the defendant, were statements in favor of his principal. As such they were neither competent nor relevant and were properly excluded. Proctor v. Loomis, 35 Mo. App. 482; Sira v. Railroad Co., 115 Mo. 127; Hall v. Hall, 34 Ind. 314; Havens v. Gilmour, 82 N. Y. Supp. 511. (3) The plaintiff seeks equitable relief. It must, therefore, do equity, and the court must consider any facts disclosed by the record, which tend to show that plaintiff's complaint is not well founded. Ess v. Griffith, 139 Mo. 322, 332; Bremen Bank v. Branch, 104 Mo. 440; 16 Cyc. 809. If it becomes apparent from the evidence that the plaintiff cannot recover for want of equity, it is not necessary that the facts showing this want of equity be expressly pleaded. Ess v. Griffith, 139 Mo. 322, 332; Curtis v. Moore, 162 Mo. 442; Young v. Glascock, 79 Mo. 576; Price v. Hallett, 138 Mo. 561; McDonnell v. Bedgasso, 175 Mo. 275; 16 Cyc., 675 to 785.

BROWN, C.—This suit was instituted in the Circuit Court for the City of St. Louis on October 1, 1918. Its general purpose was to cancel and set aside certain promissory notes purporting to be executed by the plain-

tiff corporation to one Oonk, a teller of the defendant bank, on April 19, 1917, as collateral security for alleged indebtedness of plaintiff to said bank of an equal amount; and also to set aside and cancel a deed of trust to one Schulte, as trustee, to secure the payment of said notes. These notes consisted of a principal note for the sum of $50,000 and for semi-annual interest notes for the sum of $1375 each. The property which the deed of trust purported to convey was real estate in the city of St. Louis alleged to be worth the amount of the principal note or more.

These instruments appear to be signed with the name of the plaintiff corporation by William Grafeman, its president.

At the time of the institution of the suit the trustee, Schulte, had already instituted proceedings to foreclose the deed of trust for the defendant bank, to which the collateral notes had been transferred by Oonk, and had advertised the land for sale pursuant to its terms.

The petition, in addition to the foregoing facts, alleged: "That said notes and said deed of trust were never executed by the plaintiff; that said purported notes and deed of trust were never authorized by the board of directors, nor by the stockholders of the plaintiff; that plaintiff never received any money or other thing of value from the said William H. Oonk or any other person, on account of said purported notes and deed of trust; that plaintiff never received the consideration alleged in said purported notes and deed of trust, and that if the said William Grafeman executed said purported notes and deed of trust he did so on his own account and responsibility, and without the authority, knowledge or consent of plaintiff, and that the defendants well knew all such facts, and at the time of acquiring their alleged interest and ownership in and of said purported notes and deed of trust well knew and understood such facts; that if the negotiation and transfer of said purported notes is not restrained and the notes canceled, and if the sale of said real estate under

said purported deed of trust is not restrained, plaintiff will suffer irreparable injury; and that plaintiff has no adequate remedy at law in the premises.''

The court awarded a preliminary injunction upon these statements and the prayer of the petition.

The defendant bank filed an answer, upon which all the issues stand. It made the conventional admissions as to the corporate character of parties, the acquisition and ownership of the notes and deed of trust securing them, the proceedings taken for foreclosure, and denied all other allegations.

By way of counterclaim it stated that on April 19, 1917, the plaintiff owned in fee and occupied and used the land described in the collateral deed of trust in carrying on the dairy business for which it had been incorporated, and that on May 17, 1917, said notes, duly indorsed by Oonk without recourse, were delivered to it by plaintiff, with a contract in writing pledging them to the defendant bank as security for the payment at maturity of another promissory note executed and delivered by plaintiff to the bank on that day, for fifty thousand dollars, payable three months after date, with interest at five and a half per cent, which was renewed at maturity for a like term; and default having been made in the payment of the renewal, the pledge had been duly foreclosed, according to its terms, and the bank had thereby acquired the title to the collateral notes secured by the deed of trust described in the petition. It therefore asked that the injunction be dissolved and that the bank be permitted to proceed with the foreclosure.

The answer next contains a count in ordinary form, as holder in due course, for judgment on the principal note of April 19, 1917, and for foreclosure of the mortgage.

It next asks for judgment and foreclosure upon all the mortgage notes, which were alleged to have become due by reason of the prior defaults.

The plaintiff, by replication, put in issue the new matter in the answer, and reiterated with particularity the statement of the petition that the plaintiff did not execute or authorize the execution of the deed of trust in question, and averred that if Grafeman signed the name or affixed or caused to be affixed the seal of the plaintiff corporation to the instrument it was upon his own account, and without authority from the corporation, or its directors or stockholders, and that the plaintiff received no consideration therefor.

The facts in evidence are that the plaintiff corporation was organized and incorporated in 1892, with a capital stock of one hundred and thirty thousand dollars, to succeed to the dairy business of William Grafeman, which it did. The capital stock was increased from time to time until it finally amounted to four hundred and forty thousand dollars paid. It took over and continued the dairy business of Mr. Grafeman, and he continued to be its president and manage its business continuously up to the time of his death, which occurred on December 21, 1917, the directors being members of his own family. At the time of these transactions and for several previous years, the board had consisted of himself, his son, a nephew, a brother and a brother-in-law, Mr. Mannebach, who was, for the last ten or twelve years, secretary of the corporation and attested, and, at the president's request, attached the seal of the corporation to the deed of trust. This he had, at first, refused to do, but finally was taken by the president to see some business friends of the corporation, and consented upon their advice. While Mr. William Grafeman owned the most of the stock, there were twenty-four other stockholders named, among whom was Mr. Obernier, who had been for many years the cashier of the defendant bank, and through whom this business had been transacted. He owned ten shares of the par value of $100 each.

There is no question that Mr. William Grafeman had at all times conducted the business of the plaintiff with the same freedom as if it had been his own. Neither

the stockholders nor directors had held a meeting for several years. There is nothing to indicate that any director or stockholder other than Mr. Mannebach knew or suspected the existence of the deed of trust until after his death, although the records pertinent to that question were in court. The only business done or association had between Mr. William Grafeman and the stockholders as such seems to have been the payment by him to them respectively of such dividends as he represented had accrued and become payable from time to time. During the later years no record was made of their declaration.

Mr. Obernier, whom we have mentioned as a stockholder in the plaintiff company and who conducted for his bank the transaction in issue, was called as a witness, and testified, in substance, that on May 17, 1917, and up to November 9, 1917, William Grafeman personally owed his bank $45,000, and that on the first named day the Grafeman Dairy Company owed it $50,000, of which $10,000 was advanced that day, $20,000 on November 11, 1915, $10,000 on October 16, 1916, and $10,000 on April 20, 1917. He did not produce nor describe the notes which represented this indebtedness before it was consolidated into the single note for $50,000 mentioned in the answer. The collateral notes to Mr. Oonk were also indorsed by Mr. Grafeman, and although dated April 19, were delivered on May 17, the date of the consolidation of the company's previous indebtedness and the advancement of the last $10,000. All this business was done with the bank by Mr. Grafeman alone. The papers were already signed when brought to the bank with the exception of the collateral notes with their indorsement.

This collateral security was taken at the suggestion of the bank examiner made about the beginning of the year. He talked with Mr. Grafeman about it "around February some time," told him the bank should require collateral, and he said he could give it a deed of trust and requested an additional loan of $10,000. No security was given at the time of the advancement on April 20 of an additional $10,000. The witness told him he would have

to hold a meeting, and does not know whether he mentioned the stockholders and directors particularly. He demanded a meeting to authorize the execution of the deed of trust. He received no notice of the holding of any meeting. He read the record, the official paper, and had there been a notice of a meeting would, he says, have seen it. He asked for the records, and Grafeman told him he would send them up. The deed of trust was already recorded when delivered.

The witness asked for a statement and Grafeman told him he was going to have Mr. Kessler "the public accountant" prepare one. Although the witness knew that Mr. Kessler was at work making a statement, he never insisted on it further. Mr. Foote might have insisted; he had charge of that matter. He first became suspicious of the credit of the company when the bank examiner recommended collateral, but he still considered it worthy of credit and that the loan was good with the indorsement of Grafeman. He considered both loans, aggregating $95,000, good with Grafeman's indorsement, up to the time of his death.

With respect to his participation in the transaction this witness also testified as follows:

"Q. Now, you also told Mr. Grafeman he would have to exhibit to you a copy of the resolution of the board of directors and of the stockholders authorizing this deed of trust and note, did you not? A. Yes, sir.

"Q. Did you ever see such minutes or a copy of them? A. No, sir; I asked him for it, but he said he was going to send it up.

"Q. And without getting him to send it up, without making any further investigation, you advanced him an additional ten thousand dollars and took his deed of trust, is that right? A. Yes—we took the deed of trust.

"Q. As a matter of fact you never asked him afterwards whether or not he ever had a meeting of the stockholders or board of directors? A. Yes, sir, I did; I asked him several times.

"Q. You asked him several times? A. Yes, sir.

"Q. And even after you received this deed of trust you kept on asking him whether or not he held a meeting, did you not?

"Q. And you kept urging him to hold a meeting afterwards? A. No, I asked him for the resolution of the board.

"Q. Mr. Obernier, isn't it a fact that you wanted this deed of trust at the time that you advanced the ten thousand dollars on April 20th? A. We wanted it at that time?

"Q. Well, isn't that how the deed of trust came to be dated April 19th? A. Why, we requested it—he promised to have that deed of trust made up.

"Q. For this loan—for this ten thousand dollar loan of April 20th? A. Yes.

"Q. And you couldn't get Mr. Mannebach to sign it and he told you that, didn't he? A. No, he didn't.

"Q. And so you went ahead and advanced this ten thousand dollars on April 20th without the deed of trust? A. On April 20th?

"Q. Yes, on April 20th? A. Yes.

"Q. And you saw this deed of trust on April 19th, didn't you? A. Yes, sir.

"Q. I am speaking of April 19th? A. Not on that day, I didn't see it; no.

"Q. When did you first see that deed of trust? A. On May 17th.

"Q. You never had seen it prior to that? A. No.

"Q. You don't know how it comes that this is dated April 19th, 1917? A. No. It was made out that day, I suppose.

"Q. Now, after you got this deed of trust, on the same day, I presume, you sent it to the City Hall to be recorded, didn't you? A. No, that was recorded when I received it.

"Q. The day you received it? A. I don't know whether the day or not; it was recorded when we received it.

"THE COURT: It had been recorded when you received it? A. Yes.

"MR. SIMPSON: Q. It was already recorded when you received it? A. Yes.

"Q. Then you didn't get this deed of trust on that day—you simply got a card from the Recorder of Deeds' office saying that a deed of trust was on file for record, isn't that right? A. I suppose so; I can't remember that, whether we had the deed or just a card.

"Q. Well, you know it takes a month or so to get a deed back? A. Yes.

"Q. You know this deed of trust was recorded before you received it? A. Yes, sir.

"Q. Outside of this deed of trust which you say Mr. Grafeman gave to you on behalf of the Grafeman Dairy Company, do you know of any other deed of trust that William Grafeman executed on the Dairy Company's property? A. No, sir.

"Q. You don't know of any deed he ever made on the Dairy Company's property, do you? A. No, sir.

"Q. At the time he made this last loan, or just prior to the time he made this last loan on May 17, 1917, you told Mr. Grafeman he would have to get a statement of the company's affairs, did you not? A. We asked for a statement, yes.

"Q. And he told you he was going to have Mr. Kessler prepare one, did he not? A. I think he said that, yes.

"Q. Did you ever get that statement? A. I believe not; I would have to refer to Mr. Foote.

"Q. Did you ever ask Mr. Kessler for the statement? A. No, we asked Mr. Grafeman. I believe Mr. Foote telephoned—.

"Q. You knew Mr. Kessler was at work making a statement, did you not? A. Yes, sir.

"Q. And you never insisted on getting it? A. Mr. Foote might have insisted on getting it—he has charge of that.

"Q. Mr. Foote would have charge of that? A. Yes.

"Q. You personally did not insist on getting it? A. No.

"Q. When did you first become suspicious of the credit of the Grafeman Dairy Company? A. When the examiner recommended that we should receive some collateral for our loans.

"Q. Did you get suspicious then of the credit of the company, when the examiner suggested that you procure collateral—did that make you somewhat suspicious of the credit? A. No, I can't say it did.

"Q. You still considered the company worthy of credit? A. Yes, sir.

"Q. And you still considered that your loan was good with the indorsement of William Grafeman? A. Yes, sir.

"Q. When did your bank first become suspicious of the company, that the loan wouldn't be good without some collateral? A. Well, I don't know as they ever felt that it wasn't good.

"Q. If they ever felt it wasn't good it has been since Mr. Grafeman died, is that it? A. Yes.

"Q. Up to the time of his death you considered the loan of Grafeman and the Dairy Company both good loans, did you not? A. Yes, sir.

"Q. And the reason you required security was only by reason of the recommendation of the bank examiner? A. Yes."

Mr. E. G. H. Kessler, a certified public accountant of the city of St. Louis, testified that in that capacity he made an examination of the books of plaintiff corporation in August and September, 1917, for the purpose of making a balance sheet audit of its assets and liabilities, at the request of Mr. William Grafeman who said he had promised the statement to the Northwestern Bank. Mr. Foote for the bank called him up once or twice and asked him whether he was proceeding with the preparation of the balance sheet and when he would be through. The statement was of July 31, 1917. It was made from the books of the Grafeman Dairy Company,

and information obtained from the bank with which that company did business. There was no record on the books of the company of the $50,000 loan in question beyond an entry in the pass book and one or two entries growing out of the previous loan into which this one was consolidated on the Grafeman account. One of them was on November 30, 1915, for $20,000, appearing on the company's ledger in the account of William Grafeman. There is no explanation whatever of this upon the books that would throw any light upon it; nor show that the bank had any connection with it. On the journal it is credited to Mr. Grafeman and charged to cash. Had the money been obtained from the bank it should have been charged to cash and credited to bills payable.

There is an item on the ledger of date October 31, 1916, for $10,000 in the account of Grafeman, with nothing to indicate that it was derived from the bank. Nor is there any such indication in the journal entry. These two items amounting to $30,000 might have been derived from the bank. No entry appears upon the company's books of account as to the two items of $10,000 each included in the $50,000 note of April 19, 1917, or that the company received those amounts or either of them.

On completing the audit the witness furnished Mr. Grafeman with three copies.

The witness was then asked, "Does that audit show any amount owing by William Grafeman to the Grafeman Dairy Company?" The defendant objected to this as "utterly immaterial to this inquiry now," which was sustained by the court and plaintiff duly excepted. Continuing, the witness stated that the account of the Northwestern Bank as shown by the company's books differs from the account shown on the bank's own books in several respects. The only explanation was given by Mr. Grafeman to the witness as soon as he found the difference. The plaintiff's counsel then stated that he desired to prove by this witness admissions made by Mr. Grafeman against his own pecuniary interest. The court,

against the objection duly made by defendant on the ground that such admissions would not bind defendant bank, permitted him to proceed, reserving its ruling upon the objection.

The witness then stated that when he called Grafeman's attention to the difference, and asked him how it arose, and whether he had any details, check, etc.—check stubs, books to explain the difference so that he could charge the various items to the proper account—neither he nor Mr. Mannebach could give details to explain it. Witness told Grafeman that the only thing he could do was to charge the whole thing to him, because it seemed he had withdrawn the money, and he agreed to do that. That the difference in the Northwestern Bank account of July 31, 1917, consisting of checks not shown on the the books, was $68,662.28, which was charged to Mr. Grafeman in the statement furnished him.

Plaintiff's counsel then asked witness if Mr. Grafeman when furnished with the report ever made any objection against those charges. To this defendant's counsel said: "We object to that, if your Honor please." The court said: "I am going to sustain the objection. I can't see for the life of me how that can affect this." After further talk the court continued: "Of course, this matter will come up on motion for a new trial. What a dead person said against his own interest, how that can be effective—I can exclude it afterwards, and you can save your exception. I will reserve my ruling on it." The witness answered he didn't. The witness then stated, against the same objection, that the total amount of these charges against Mr. Grafeman arising out of the transaction with the Northwestern Bank was $82,695.22. The examination proceeded as follows:

"Q. Did you have any conversation with Mr. Grafeman with reference to the indebtedness of the Grafeman Dairy Company to the Northwestern Bank on account of the fifty-thousand dollar note which is concerned in this suit?

"MR. MUENCH: We make the same objection.

"THE COURT: You are leading up to something I ruled out of order this morning, Mr. Simpson, on the other man's testimony. Now, you are getting it in by this expert. I don't know—I feel I ought to be consistent and rule it all out. I will rule all that testimony out—all that hearsay testimony. I don't think it is binding against this defendant.

"To which ruling of the court the plaintiff, by counsel, duly excepted then and there at the time.

"Q. I will ask you, Mr. Kessler, whether or not you had a conversation with Mr. Grafeman in which he explained the manner in which he procured this fifty thousand dollars from the Northwestern Bank?

"MR. MUENCH: We object to that.

"THE COURT: Objection sustained.

"To which ruling of the court the plaintiff, by counsel, duly excepted then and there at the time."

The witness then proceeded to state in substance that when he first began this audit he procured the pass book of the Dairy Company from Mr. Mannebach, found the cancelled checks or stubs of the checks drawn by the Dairy Company on the Northwestern Bank among the papers of the company. That the books of the company showed no indebtedness of the Northwestern Bank during 1915, 1916 and 1917; that since the audit of July, 1917, they had been unable to find these checks. The witness further stated that the $50,000 included in the note of the Dairy Company of May 15, 1917, consisted of the following items: November 11, 1915, $20,000; October 16, 1916, $10,000; April 20, 1917, $10,000; May 17, 1917, $10,000. None of this was credited in the Grafeman Dairy Company's books.

I. This case stands entirely upon the validity and effect of the collateral deed of trust dated April 19, 1917, to secure a collateral note of that date for the sum of fifty thousand dollars, payable two years from that date, with accompanying interest notes. It was signed by Mr.

Authorization
by Board of
Directors.

William Grafeman, the president of the plaintiff, and a member of its board of directors, bore the seal of the corporation, was attested by Mr. Mannebach, its secretary, and was duly acknowledged by the president, the certificate stating that it was done by authority of its board of directors.

The board of directors consisted of the president, the secretary, his brother-in-law, and three other near relatives of the president. Although the by-laws provided that the directors should hold monthly meetings, yet the defendant bank says in its statement that "that provision was honored only in its breach, and never in its observance. While at first the directors met at least annually, yet even that empty form was omitted in the last three or four years of Grafeman's incumbency." They never acted upon this mortgage, and it is not suggested that either of them, except the two who signed and attested it, knew of its existence until after the death of Mr. Grafeman on December 21, 1917. The first question presented is, therefore, whether the law requires such authority for the conveyance by the officers of a corporation of its lands. It is not complicated with any question of the authority of the managing officers of a corporation to deal with its property in the ordinary course of the business for which it was incorporated, for this was not property acquired or held for purposes of traffic, but was its home; its principal office; its abiding place for all corporate purposes. Its use reached down and included necessary incidents of all its corporate functions. Its visible existence was there, and it seems to follow that if there be any rule recognizing that the conveyance of lands should require the authorization of the corporation through its governing body, and should not be vested in the sole discretion of any mere executive officer created by appointment of that body, that rule should apply to this transaction.

That there is such a rule is beyond all question. It is stated by Fletcher in his Cyclopedia of Corporations, vol. 3, sec. 1299, as follows: "Independent of statute,

the board of directors not only may, but must, authorize the execution of a corporate mortgage. Particular officers cannot, ordinarily, execute a mortgage, without being authorized so to do by the board of directors.'' This court, in Bank v. Bank, 155 Mo. 95, has expressed the same doctrine. That case is interesting in its application to the one before us. John Moran was the president and sole stockholder of the Moran Packing Company, an Illinois corporation, except for qualifying shares held by each of his four associate directors. He borrowed for his company fifty thousand dollars from the State National Bank, of St. Joseph, Missouri, for which he executed the notes of the corporation, with a deed of trust on its plant in Missouri securing their payment. The Union National Bank of Chicago attached the same property in a suit against the Moran Packing Company on an indebtedness to itself, and, having recovered judgment, sued to set aside the deed of trust on the ground, among others, that the action of the directors' meeting at which it was formally authorized was defective, and insufficient for that purpose.

This court, in sustaining a judgment for the plaintiff setting aside the deed, in a thoroughly considered opinion by BURGESS, J., said:

''A final contention is that the deed of trust in question was made by John Moran, the president of the packing company, who was the owner of the entire capital stock of the company, and was valid without the action of the directors. In support of this position, defendant relies upon Union Nat. Bank. v. Shoemaker, 68 Mo. App. 592. That case is predicated upon the ground that the persons who made the sale of the property involved in that litigation were the only stockholders and directors of the corporation, and were, in fact, the corporation, while in the case at bar there were four directors beside John Moran, and although they may have been nominal stockholders they, together with Moran, composed the board of directors, and without the authority of the board he had no right to made the deed of trust.

We do not therefore think that case an authority in this.

"Now if the meeting of the board of directors directing John Moran, the president of the John Moran Packing Company, to make the conveyance had been held in Illinois in accordance with the provisions of the charter of the company, instead of in this State, there is no question but that it would have been valid. But such an instrument cannot, under the circumstances disclosed by this record, be legally executed without such authority. [Missouri Lead M. & S. Co. v. Reinhard, 114 Mo. 219; Calumet Paper Co. v. Haskell Show Ptg. Co., 144 Mo. 331.]"

This, so far as we have been able to gather from the excellent briefs of counsel, as well as from a rather painstaking examination for ourselves, fairly expresses the law of this State as hitherto administered by. this court. It had already been held in Hill v. Hill Coal Mining Co., 119 Mo. 9, that the validity of a contract by the corporation for the purchase of coal lands depended upon the sanction of the majority of the directors acting at a meeting to which all were called by notice, and that no director could be counted in such majority who was interested in the purchase or sale of the lands otherwise than through the corporation he represented at such meeting. The same doctrine was considered and approved in Mining Company v. Taylor, 247 Mo. 1. The case last cited is interesting in that it holds that a corporation may be estopped to deny the validity of a fully executed contract made by a majority of its directors while it was in embarrassed circumstances, at a meeting of which the minority were not notified, to sell its land, a mine, in consideration of full payment of all its debts. The purchaser, without knowledge of the failure to give the proper notice to the directors, paid all the debts, took possession of the mine, and. continued to operate it, spending large sums of money in improvements, with full knowledge of all members of the corporation.

That case affords an excellent illustration of the principle involved in this. The corporation is an instrument created by the State for the aggregation of capital in enterprises to be organized and conducted for the benefit of whoever may happen at the time to be stockholders, under rules of safety established by law. Its existence requires and implies a control which stands in place of and for the individual investors in the possession and management of the fund. This control lies in the directors or trustees. They are the corporation. The president and other officers whom they appoint are agents of the corporation. While its *business* may be conducted through them, corporate acts, like the conveyance of its lands, are required to originate in the will of the directors. The Legislature recognized and acted upon this when, in the form which it suggested for the acknowledgment of deeds by corporations, it took the trouble to insert a sworn statement of the president or other chief officer that it ''was signed and sealed in behalf of said corporation   .   .   .   by authority of its board of directors.''   [R. S. 1919, sec. 2188.]   While this provision is, by its terms, simply directory, it conclusively implies that *the fact* was, in the legislative mind, an element of all corporate conveyances of land. That the corporation, through its board of directors, may be estopped by equitable considerations from denying its autorization, results from the fact that the board of directors is, in this respect, the corporation.

II.   Although the deed in this case is perfectly regular on its face, it is admitted in the record that it was not authorized by the directors, and it is evident that the majority of them knew nothing about it until after the death of the president. That no one claiming under it ever had possession of the land is also admitted. That is one of the remedies sought by the defendant bank in this suit. It is simply said that the money of the bank was loaned to the plaintiff corporation on the security of this deed of trust,

Equitable
Estoppel.

and that the plaintiff is estopped from denying its validity without returning the money. The deed is, it says, fair on its face, and including its affidavit of acknowledgment, states and represents that all things necessary to its validity were done and authorized by the grantor corporation—that if these statements and implications are false the bank has been deceived by this fair face, and the loss should fall upon the one guilty of the deception. Thus it happens that the doctrine of equitable estoppel is invoked as a defense, and the burden of establishing it falls upon the bank.

That equitable estoppel cannot be interposed to defeat a recovery upon the legal title without pleading it, has been established in this State by a long and consistent line of decisions of this court. [Bray v. Marshall, 75 Mo. 327; Noble v. Blount, 77 Mo. 235; Chance v. Jennings, 159 Mo. 544; Sanders v. Chartrand, 158 Mo. 352; Avery v. K. C. Southern Ry. Co., 113 Mo. 561, 568; Throckmorton v. Pence, 121 Mo. 50, 60; Central National Bank v. Doran, 109 Mo. 40, 51; Cockrill v. Hutchinson, 135 Mo. 67, 74; Swinhart v. Railway Co., 207 Mo. 423, 438; Turner v. Edmonston, 210 Mo. 411, 428; Coleman v. Insurance Company, 273 Mo. 620, 631.]

On the other hand, the defendant bank insists that this is not a suit upon the legal title, the chief incident of which, the possession, is still enjoyed by the plaintiff, but that it is a suit in equity, to assert the equitable right to have a cloud upon the legal title removed by the court, and that the burden is consequently upon the plaintiff to establish its equitable right to the equitable remedy it seeks, which includes not only the removal of a cloud from the title which it asserts, but also injunctive relief.

The cloud of which plaintiff complains is the deed of trust. It not only charges that this instrument is unauthorized by the board of directors, and therefore void, but it also charges that it is without consideration; that the plaintiff never received any money or other valuable thing in connection with it or the notes which it purports to secure. Should the first of these charges

be established, should it be made to appear at the trial that the deed of trust was not authorized by the board of directors and was therefore void at law as between the parties, it would, as we have already said in a previous paragraph, devolve upon plaintiff to plead and prove such equitable defense as it might desire to assert in derogation of the legal title. Instead of so pleading, the answer of the bank stands solely upon the legal title acquired by the deed.

Notwithstanding this the bank insists that if the plaintiff has shown by its own evidence that it ought not, in equity to have the relief demanded in its petition, it is the duty of the court to withhold it even though it be not pleaded as an affirmative defense. We are inclined to agree to this proposition to the extent of examining the evidence to ascertain whether or not it shows that the plaintiff is estopped, in equity, from asserting the invalidity of the deed of trust which we have already said is invalid for want of authority in the plaintiff's president to execute it.

III. The deed of trust, as well as the collateral notes which it secures, is dated April 19, 1917. It was acknowledged on May 15, 1917, and was filed for record in the office of the Recorder of Deeds on May 25, 1917. The principal note, which these collaterals were made to secure, was dated May 17, 1917. Mr. Obernier, the cashier of the defendant bank, testified repeatedly that the deed of trust had already been recorded when delivered to him, and we may take it as true. We mention these dates now that we may have them in mind while we inquire whether any money, and if so how much, was advanced by the bank on the security of these collaterals.

*Evidence of Estoppel.*

There is nothing in the record which tends to show the amount of stock held by any of the twenty-four stockholders beside Mr. Grafeman except that Mr. Obernier, the cashier of the defendant bank who acted for it in the transaction, held one thousand dollars in par value. However much or little it may have been, they were all en-

titled equally to the protection which the law extends over their investment. As we have already said, the board of directors constituted the visible body of the corporation. Mr. Grafeman, the president, was the autocrat who directed its activities. In withholding from him the power to make a conveyance of land without authority of the board of directors, the law certainly withholds from him the power to ratify his own deed made without such authority. Who, then, is the *corporation,* whose power continues when that of the officer ends, and who may give life to his *ultra vires* acts?

Ratification is simply an agreement to adopt the act of one who has assumed, without authority, to act for another. To be effective, it must, of course, be made by one having power to do the act for himself. We do not understand these platitudes to be denied. We do understand the defendant bank to mean that Mr. Grafeman acted in two distinct capacities. As president of the corporation duly elected to the office by the board of directors, he executed the deed by virtue of his statutory power; but having failed to obtain the authority from the corporation necessary to its validity, it was ineffectual as a conveyance. He then, by virtue of his autocratic power over the business, assumed to be the *corporation,* and it is upon what he has done in that capacity that the bank seems to rest its title. We do not understand it to say that as the corporation he ratified his void act as president. This would involve an obvious contradiction of terms. They rather say that the receipt and retention of the money in his capacity as manager of the business of the corporation, estops the plaintiff to deny the validity of the security upon which it was procured. The defense rests upon equitable estoppel, and it is to that doctrine that our attention must be directed.

In De Lashmutt v. Teetor, 261 Mo. 440, we defined estoppel *in pais,* or equitable estoppel, as "that condition in which justice forbids that one speak the truth in his own behalf." We noticed with satisfaction that the learning on this subject is, as it should be, the learning

of all, quoting the definition of Webster of "estoppel *in pais*," or "equitable estoppel," as that "which, when a party by his conduct or language has caused another reasonably to believe in the existence of a certain state of things, and (having a legal right so to do) to act upon the belief, precludes him from averring or setting up, to the prejudice of the latter, that a different state of things existed at the time in question."

In 10 R. C. L. 689, the same subject is more elaborately treated as follows: "A person is held to a representation made or a position assumed, where otherwise inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has, in good faith, relied thereon." Few American courts have had more frequent occasion to discuss the principle than this. In an early Missouri case this court stated the elements of equitable estoppel as follows: "To constitute an estoppel *in pais* it is said in Dezell v. Odell, 3 Hill, 219, that there must be, first, an admission inconsistent with the evidence proposed to be given, or the claim offered to be set up; second, an action by the other party upon such admission; third, an injury to him by allowing the admission to be disproved." The court also called attention to the fact that the doctrine of equitable estoppel was then as old as the Statute of Frauds, and as such, a part of the law of the land. [Taylor v. Zepp, 14 Mo. '482.] It has in many cases, though perhaps in different forms, adhered to the same doctrine down to the present time. [Newman v. Hook, 37 Mo. 207; Chouteau v. Goddin, 39 Mo. 229; Bales v. Perry, 51 Mo. 449; Stagg v. Linnenfelser, 59 Mo. 336; Austn v. Loring, 63 Mo. 19; Acton v. Dooley, 74 Mo. 63, 69; Blodgett v. Perry, 97 Mo. 263, 273; Burke v. Adams, 80 Mo. 504, 514; Monks v. Belden, 80 Mo. 639, 642; Gentry v. Gentry, 122 Mo. 202, l. c. 221; DeBerry v. Wheeler, 128 Mo..84; Bank v. Ragsdale, 171 Mo. 168, 185; Spence v. Renfro, 179 Mo. 417, 422; Harrison v. McReynolds, 183 Mo. 533, 547; Keeney v. McVoy, 206 Mo. 42, 57; Milan Bank v. Richmond, 217 S. W. 74; Mat-

thews v. Van Cleve, 221 S. W. l. c. 38; Berry v. Massachusetts Bonding Co., 221 S. W. 748, 752; In Re Doe Run Lead Co., 223 S. W. l. c. 609.]

In nearly all of these cases, extending, as they do, over the entire judicial history of our State, the thought is prominent that an equitable estoppel cannot be founded upon facts which are equally within the knowledge and intent of both parties. Were the law otherwise, estoppel might easily be made an instrument of fraud. The inequality of the parties has been and is the touchstone by which it is tested. In Austin v. Loring, supra, we said: "If no one has been misled to his damage, if no injury has arisen from the conduct, declarations or silence of a party, he will not be estopped from contradicting them, and a party will not be allowed to avail himself of an estoppel when he knew or had the same means of knowledge as the other party." In Bales v. Perry, supra, we said: "If, therefore, the truth be known to both parties, or if they have equal means of knowledge, there can be no estoppel." In Spence v. Renfro, supra, we said: "So if the facts be known by both parties, or if they have equal means of ascertaining them, there can be no estoppel." In In Re Doe Run Lead Co., supra, the latest expression before us, we put it as follows: "In order to make good a plea of estoppel, it is necessary both to allege and to prove that one has been misled to his hurt." In Gentry v. Gentry, supra, at page 221, the rule as stated in Bigelow on Estoppel (5 Ed.) page 570, was stated and approved in the following language: "*First.* There must have been a false representation or a concealment of material facts. *Second.* The representation must have been made with knowledge, actual or virtual, of the facts. *Third.* The party to whom it was made must have been ignorant, actually or permissibly, of the truth of the matter. *Fourth.* It must have been made with the intention, actual or virtual, that the other party should act upon it. *Fifth.* The other party must have been induced to act upon it."

Grafeman Dairy Co. v. Northwestern Bank.

In Hector v. Mann, 225 Mo. 228, this court, in an opinion by LAMM, J., who also wrote the opinion in Keeney v. McVoy, supra, directed attention to another defense called *quasi-estoppel,* which might be made available to sustain titles arising from judicial sales, where the price had been accepted by the owner with knowledge, or the equivalent of knowledge, of all the circumstances of alleged infirmity. In Troll v. St. Louis, 257 Mo. 626, that case was referred to with the simple statement that the doctrine denominated "*quasi*-estoppel" was not invoked in the case before the court. It was again referred to in DeLashmutt v. Teetor, with the statement that there was nothing in it, nor in the line of cases it cites, inconsistent with the doctrine of equitable estoppel as we have here stated it. It simply holds "that in case of execution and judicial sales a party to the suit who, with knowledge of all the facts affecting his rights, take down a surplus of the purchase price coming to him from the sale on the theory of its validity, thereby ratifies the proceeding to the extent of the part so adopted." A careful examination of all the Missouri cases in which the Hector-Mann case is cited fails to disclose any instance of the application of the doctrine of "*quasi*-estoppel" against one receiving money arising from a judicial sale without knowledge, either actual or imputed, of the fact of its invalidity.

It remains for us to apply these principles to the facts developed by the plaintiff at the trial.

IV.  These facts are few and simple. The visible existence of the plaintiff had, before the story begins, been swallowed up in the person of Mr. Grafeman. Like the "elderly naval man" in Mr. Gilbert's "Yarn of the Nancy Bell," he had assimilated the captain and crew, including the cook, of the Dairy Company, so that for several years there had been no interference in his management. Under such circumstances it is natural and almost inevitable that doubt should have arisen as to his identity—as to

Evidence of Estoppel.

whether, in a given business transaction, he was simply William Grafeman, or the Grafeman Dairy Company. About the beginning of the year 1917 a bank examiner, in his investigation of the affairs of the defendant bank, advised it that it should have further security for the Grafeman paper.

Thus arose the first suspicion the cashier had ever expressed as to the soundness of the Grafeman paper, although he says he still believed that the obligations of the Dairy Company were good with Mr. Grafeman's indorsement. He does not inform us of the amount of the indebtedness to the bank of either Grafeman or his company when he received this significant hint from the bank examiner, although he does say with cautious particularity that about four months afterward and on May 17, 1917, the date of the Dairy Company's note for $50,000, his personal indebtedness amounted to $45,000. It is admitted that $20,000 of the Dairy Company's indebtedness was advanced to it after the interview with the bank examiner, so that we may safely assume on the authority of the cashier, that, at the time this hint was. received, the company was indebted to his bank in the amount of $30,000. This added to Grafeman's indebtedness made a total of $75,000.

Upon the suggestion of the bank examiner calling for further security, the defendant got busy. It demanded not only additional security, but a statement, and Grafeman promptly promised this mortgage, and also to employ Mr. Kessler, a "certified public accountant," to make the statement required. The pending additional security seemed to be a matter pertaining to the duty of the cashier; and he took it up with Grafeman in February. The matter of obtaining the statement pertained to the duty of Mr. Foote, the "note clerk" of the bank, and he took it up with Kessler, who was employed by Grafeman for that purpose. Trouble soon arose in both branches of this work. The certified accountant, Mr. Kessler, ascertained, in the course of his examination, and so reported, that Grafeman was in-

debted to the corporation on account of various sums
withdrawn by him from the Northwestern Bank and un-
accounted for, in the sum of $68,662.28, which, with other
sums arising from the bank transaction, made a total
deficiency of $82,695.22.  This amount was, by Mr. Kess-
ler, upon consultation with Mr. Grafeman, charged to
the personal account of the latter without objection
from him.

When Mr. Grafeman promised, in February, 1917, to
give this mortgage by way of collaterial security to the
Northwestern Bank, he assumed an undertaking not
entirely without difficulty.  Five or six weeks before the
final execution of the mortgage he put the matter up to
Mr. Mannebach, a member of his board of directors and
secretary of the company.  Mannebach refused to take
part in its execution.  He persisted in his refusal until
Mr. Grafeman persuaded him to go with him to the
office of Aiple and Hemmelman, when Mr. Hemmelman,
in whom he seemed to have great confidence, persuaded
him that it would be all right for him to attest the deed,
which he accordingly did.  Mr. Obernier, the cashier, had
told Mr. Grafeman that he would have to exhibit to him
a copy of the resolution of the board of directors and
of the stockholders, authorizing the deed of trust, and
it was natural that after the five or six weeks of effort
he has expended on his brother-in-law Mr. Mannebach,
he should be careful about approaching the others on
the same subject, and the record shows that he refrained
from doing so.  Mr. Obernier says he asked him from
time to time to produce the records, but he never did so,
and it seems to be conceded that no other person con-
nected with the board ever knew of the transaction un-
til after Mr. William Grafeman's death.  While Mr.
Obernier was urging Grafeman for the security, Grafe-
man was with equal persistence and perhaps with better
success, urging Obernier for more money.  The collateral
papers, including the deed of trust, were signed, acknowl-
edged and prepared for record on April 19, but Grafe-
man still clung to them with so much tenacity that the

bank advanced him another $10,000 on the next day. What excuse was given for retaining them still longer is not mentioned. It might have been that the cashier desired to incorporate in the file which contained them the coveted record of the board of directors, or it may be that the bank was not ready to pay the price, but whatever may have been the cause of the delay an additional $10,000 was advanced on May 17, and after a further delay of eight days, the deed of trust was delivered, with a receipt of the recorder, on the 25th.

While the testimony of Mr. Obernier, under cross-examination of his bank, may have shown some indication of weakening and uncertainty, there is nothing which casts doubt upon the direct and positive story of his demands for a copy of the resolution of the board of directors of the Dairy Company authorizing the deed of trust. That the bank, through its cashier, knew that this could not be accomplished is certain, and that it deliberately and purposely took what it could get in the way of security is not open to doubt. That during the three or four months that elapsed after it was admonished by the bank examiner, it tried its best to lawfully obtain the security required appears in every line of his testimony. That the president was afraid to approach his relatives who constituted his board of directors with the exception of the one to whom he paid a salary for twelve or fourteen years, appears plainly by the testimony. That Mr. Grafeman was able to take advantage of the banker to squeeze from him the last $20,000 by dangling before his eyes the hope that the deed of trust might save its investment, is the most curious feature of the transaction.

Not a cent seems to have been advanced on the security of this deed. It was given to save what was at best an old indebtedness; $30,000 of the amount had, originally, no connection with the transaction. The remainder of $10,000 on April 20, 1917, and of the same amount on May 17, were simply the bait used to capture security for the larger amount. There is no reason

shown why it should take precedence over any other indebtedness of the corporation.

In our opinion, formed from an attentive reading of the testimony admitted at the trial and not afterward excluded, the note for which the notes and deed of trust in suit were given as collateral, represented a personal debt of Mr. Grafeman and had no connection whatever with the business of the company. Mr. Kessler was employed to examine the books of the corporation for the purpose of making a balance sheet showing its assets and liabilities to be used in connection with these same securities. He had access to all books and accounts of the bank bearing upon that question, and Mr. Foote, the note clerk, represented the bank. Mr. Kessler's statement of what he saw in and gathered from these sources of information was evidently admissible, but it fails to sustain the burden which, as we have said, rests upon the defendant to sustain the void deed by estoppel. The plaintiff offered to prove upon the trial that Mr. Grafeman accepted the charges made against him in this settlement. The statement was made upon the demand of the defendant bank, and, although it was not completed until after the execution of the deed, it was a part of the same transaction.

V. The books of the Dairy Company did not show that any part of the fifty thousand dollars included in the note of May 17, 1917, had been received by the company from the bank. The book and vouchers of the bank showed that Mr. Grafeman had drawn from the bank on checks and other vouchers of the company $68,662.28 not charged to him on the books of the company, and that his total indebtedness arising out of the transaction with the Northwestern Bank was $82,695.22, all of which was charged to him by Mr. Kessler at his suggestion and with his consent. This testimony was finally excluded by the court at respondent's instance. This action was properly saved and is assigned for error.

Admissions.

This evidence, if true, shows that the proceeds of this loan were absorbed by the president. Whether it was used to pay his pre-existing debt to the Dairy Company is not material. The facts were known to the bank through Mr. Obernier and Mr. Foote as perfectly as they were known to Mr. Grafeman himself.

The question is whether the corporation, for whom it may concern, including such honest creditors as it may have, is now entitled to the benefit of the same information. Grafeman is dead, and his admission is offered by the plaintiff for that purpose. Is it admissible?

The object of the suit is to cancel a deed made by Grafeman for and in the name of his corporation, to secure the payment of a certain note of the corporation. On the trial it appeared that the deed is void at law for want of authority from the corporation to its president to make it. The question was then presented whether it ought to be made a condition to the granting of the equitable relief asked by plaintiff, that it repay the money it was said to have received upon the security, on the ground that the plaintiff was estopped in equity to deny the sufficiency of the deed while retaining its benefits. It was upon this ground that the admissions of Grafeman tending to show that the corporation had received no money, but that the entire consideration of the deed went to him, became pertinent to the issue. Being dead the evidence of his admission at or soon after the time of the transaction became the best evidence of his knowledge of the fact.

Had the plaintiff in its petition admitted the general authority of Grafeman to borrow $50,000 from the bank and to execute the conveyance in question to secure its repayment, but had alleged that the amount or some portion of it consisted of a personal debt of Grafeman to the bank, from which the corporation had derived no benefit, all of which the bank well knew at the time, and had asked for an accounting and settlement of the security on that basis, there can be no doubt that Grafeman would have been a proper party to the issue, at plaintiff's

election, as well as a party in interest to the extent of
his liability to the bank included in the transaction. So
far as the issue in this case is concerned, his interest is
precisely the same. The question stands upon his duty
to pay his debt to the bank either directly or through the
Dairy Company. In either case the cost to him will be
the same. His admission that he is so liable stands
upon the same ground as if he were a party to the pro-
ceeding, and its exclusion from the consideration of the
court was error. [Wynn v. Cory, 48 Mo. 346; Stewart
v. Glenn, 58 Mo. 481; Obuchon v. Boyd, 92 Mo. App. 412.]

Recapitulating, we hold that the deed of trust in
suit, having been made by the president of the plaintiff
without authority from its board of directors, is in-
operative and void for the purpose of giving to the de-
fendant bank priority over other creditors as to any
indebtedness theretofore existing, or created at the
time with knowledge on the part of the bank of such
want of authority. That the defendant bank, through
its cashier, well knew of such want of authority at the
time it received the deed of trust. That while it is nec-
essary to plead equitable estoppel when it is relied upon
as a defense, either at law or in equity, yet in suits for
equitable relief, when the plaintiff shows by its own evi-
dence that it is estopped in equity from demanding such
relief, it will not be granted, whether the estoppel be
pleaded by defendant in its answer or not.

The case made by plaintiff is far from showing any
equitable ground for giving this indebtedness preference
over any other indebtedness of the plaintiff. The most
of it was long past due before this security was ever
suggested, and the evidence suggests strongly that the
remainder was created for the purpose of procuring the
deed of trust regardless of authority from the board to
execute it. The evidence, in the present condition of the
case, also tends strongly to show that the deed of trust
was given and received under an arrangement between
Mr. Grafeman and the bank to secure the indebtedness
of the former and not the indebtedness of the Dairy Com-
pany.

While the defendant tried its case carefully, upon the theory that the deed of trust in issue was sufficient to convey the legal title to the land, we do not think the interest of justice will suffer from a full trial of the real issue as we have stated it. We accordingly reverse the judgment of the Circuit Court for the City of St. Louis, and remand the cause for that purpose. *Ragland* and *Small, CC.*, concur.

PER CURIAM:—The foregoing opinion of Brown, C., is adopted as the opinion of the court. *James T. Blair, C. J.*, and *Graves, David E. Blair* and *Walker, JJ.*, concur; *Elder, J.*, concurs in the result; *Woodson, J.*, dissents; *Higbee, J.*, concurs in reversing the judgment and remanding the cause, but is of opinion that a judgment for appellant should be directed.