JOSEPH S. KASZUBOWSKI, Plaintiff, *v.* BUFFALO TELEGRAM COR-
PORATION and Others, Defendants.

Supreme Court, Erie County, March 6, 1928.

Corporations — sale of corporate property — publishing plant of news-paper was sold and chattel mortgage taken back — said property was retaken upon default by chattel mortgagee — resale of property at public auction without consent of two-thirds of stock violates Stock Corporation Law, § 20 — provision in certificate authorizing corporation to buy, sell, rent and exchange real property did not authorize sale without necessary consents — purchasers must return property and corporation must return purchase price paid.

This is a proceeding to set aside the sale of corporate property on the ground that it was made in violation of section 20 of the Stock Corporation Law in that the consent of two-thirds of the stock issued and outstanding and authorized to vote on the question was not obtained prior to the sale. The defendant corporation was organized by the consolidation of two corporations. One of

the consolidating corporations was engaged in publishing a newspaper and in doing job printing work while the other corporation was a finance corporation. The certificate of incorporation of the two consolidating corporations extended very broad powers to the new corporation. The defendant sold the property in question consisting of its printing plant and newspaper and also the good will of the newspaper and plant and took back a chattel mortgage to secure a portion of the purchase price. The purchaser defaulted on the chattel mortgage and the defendant corporation retook the property and subsequently sold it at public auction. That sale is the one in question in this proceeding.

The sale transferred a substantial part of the defendant's property and was not one made in the ordinary course of business and, therefore, it was necessary to procure the consent of two-thirds of the stock issued and outstanding and authorized to vote on the question of sale as required by section 20 of the Stock Corporation Law in order to make the sale a valid one.

Said section prohibits the sale of corporate property or any part thereof except on the required consents, and the mere fact that it might have been a business necessity to make the sale does not relieve the corporation from procuring the necessary consents.

Although the certificate of incorporation of one of the consolidating corporations gave that corporation broad powers to buy, sell and exchange real property and generally to deal in real property, that provision was limited by a further provision to the effect that the business should be carried on in conformity with the laws of the State and, therefore, it did not give the defendant corporation power to sell a substantial part of its property and business without the required consents. Furthermore, even though the certificate had not provided that the business be conducted in conformity with the law, a general broad power given to a business corporation to buy and sell real property does not give it the power to sell a substantial branch of its business or the property necessary to conduct it without the consent of two-thirds of its stock issued and outstanding and entitled to vote.

Therefore, the sale must be set aside but the corporation must return to the purchasers the amount paid for the property. Inasmuch as the printing press and attachments were sold by the purchasers to a third party who paid the price thereof directly to the defendant corporation the amount should be returned to the third person directly. The purchasers must account for any part of the property sold by them.

The fact that the third person purchased the printing press and attachments in good faith and without any knowledge of the defect in the title does not entitle him to retain the press for he got only such title as his vendor had and since the sale was invalid the vendor did not have any title to the press.

ACTION to set aside sale of corporate property alleged to have been made without the consent of stockholders in violation of section 20 of the Stock Corporation Law.

*Elijah H. Holt,* for the plaintiff.

*William J. Evans,* for the defendants Burg and Dyker.

*Adon W. Crosby* [*George C. Clinton, Jr.,* of counsel], for the defendant Charnock.

*Frank S. Burzinski,* for Buffalo Telegram Corporation and other defendants.

CHARLES B. WHEELER, Official Referee.    This action is brought by the plaintiff in his own behalf and on behalf of other stockholders of the Buffalo Telegram Corporation among other things to set aside as illegal and void a certain sale at public auction of the printing plant of said corporation made on January 14, 1928, to the defendants Burg and Dyker on the ground that said sale was made by the directors of said corporation without first procuring the consent of two-thirds in amount of said stockholders to said sale.

The complaint also alleges certain acts on the part of the directors claimed to constitute waste of the property and assets of said corporation, for which the plaintiff seeks to hold such directors personally liable.    It was, however, stipulated and agreed in open court that the issues as to the validity of said sale should be tried and disposed of by the referee, and the remaining issues on other branches of the case should be reserved for a further and separate hearing.

Accordingly only the issues as to the validity of said sale were heard and submitted to this referee for his determination.    It appeared upon the trial that prior to the year 1924 two domestic corporations were in business in Buffalo, one known as the Broadway Finance Corporation and the other as the Buffalo Telegram, Inc.; that in or about that year the two corporations were consolidated into the Buffalo Telegram Corporation, one of the defendants in this action.    By the consolidation the new corporation succeeded to all of the powers of the two constituent corporations. These powers were extremely broad.

The Broadway Finance Corporation had power under its charter to trade, deal in and deal with goods, wares and merchandise and property of every kind and description; to purchase, or otherwise acquire, hold, sell, mortgage, pledge, assign, transfer and generally to invest, trade and deal in, personal property of every kind and description.    The Buffalo Telegram, Inc., in addition to powers of a similar character to those described above, had specifically the power to " buy, sell, import, export, rent, lease, operate, handle and deal in paper books, magazines and printing presses, machines and apparatus and devices of every kind that may be necessary or incidental for the foregoing, or in connection with the publishing of books, newspapers and periodicals."

" 2. To buy, sell, rent and exchange real property, improved and unimproved, to build, construct and alter buildings thereon and to manage and develop real property generally; to purchase, manufacture, acquire, hold, own, mortgage, pledge, lease, sell, assign, and transfer, to invest, trade, deal in and deal with goods, wares and merchandise and property of every kind and description, and to carry on any of the above businesses or other business

connected therewith wherever the same may be permitted by law and to the same extent as the laws of the State will permit and as fully and with all the powers that the laws of the State confer upon corporations and organizations under this act and to do any and all the business above named and set forth to the same extent as natural persons might or could do."

The certificates of incorporation of the Broadway Finance Corporation and the Buffalo Telegram, Inc., and the certificate of consolidation forming the Buffalo Telegram Corporation are in evidence.

Prior to the consolidation the Buffalo Telegram, Inc., had been publishing a Polish daily newspaper in the city of Buffalo, N. Y., known as the *Telegram*. After the consolidation the Buffalo Telegram Corporation continued to publish this newspaper until the 1st day of March, 1926, at which time it sold all of its printing equipment to a concern known as the Rozan Publishing Corporation, together with the good will of the newspaper business and printing plant, and the right to use the name *Telegram*. The Rozan Publishing Company continued the publication of this newspaper for about a year, until March 16, 1927, on which date it discontinued the publication of the *Telegram* and that newspaper has never been published since.

At the time of the sale to the Rozan Publishing Company, the Buffalo Telegram Corporation took back a chattel mortgage to secure the sum of $8,800, part of the purchase price, the rental of the premises upon which the publication of the newspaper was conducted, which rental amounted to $300 monthly, and the performance of certain contracts and agreements assumed by the Rozan Publishing Company. This sale to the Rozan Publishing Company and the said chattel mortgage covered the property involved in this suit. This bill of sale and chattel mortgage are in evidence.

The Rozan Publishing Company having defaulted in its payments upon the chattel mortgage, and also in the payment of rent, the Buffalo Telegram Corporation retook possession of the property in September, 1927, and sold the same at public auction on the 5th day of October, 1927. The only bid, other than that of the corporation itself, for the entire plant, was $4,000, and the corporation bid the property in for the sum of $4,500.

Subsequently the corporation made various efforts to effect the sale of this property with a view to realizing the amount due upon the chattel mortgage and for the unpaid rentals, but until the sale which is now called in question took place, it was unable to secure a better offer than the sum of $7,500. Consequently, the directors

determined to offer the printing plant and equipment for sale at public auction with an upset price of $7,500. Accordingly, the sale was advertised to be held on January 14, 1928. At that sale there were four independent bidders, none of whom had any connection with the Buffalo Telegram Corporation and none of whom had any relations with the directors of that corporation. The bidding was spirited and was real competitive bidding. The property was struck down to Vincent A. Dyker for the sum of $12,000 after he had outbid all of the other bidders. Subsequently Dyker assigned his bid to himself, Burg and Rudnicki, and the corporation accordingly made a bill of sale to them which has been introduced in evidence. After the sale the defendant Charnock purchased from Burg, Dyker and Rudnicki for the sum of $8,750 the large press and its equipment which was a portion of the property sold to them and received from them a bill of sale thereof, which is also in evidence.

The plaintiff appeared at the sale held on January 14, 1928, and protested against said sale, and in a talk with the defendant Dyker stated to him the sale was unauthorized and that if he bought the property he, the plaintiff, would bring suit against him. The question for the referee to pass on is the validity of the sale made on the 14th day of January, 1928.

The plaintiff contends the sale made violates section 20 of the Stock Corporation Law, providing: "A stock corporation, except a railroad corporation and except as otherwise provided by law, with the consent of the holders of record of two-thirds of its outstanding shares entitled to vote thereon may sell and convey its property, rights, privileges and franchises, or any interest therein or any part thereof; but franchises within the state may be sold only to a domestic corporation. Before such sale or conveyance shall be made such consent shall be obtained at a meeting of the stockholders called pursuant to section forty-five."

It is conceded the consent of two-thirds in amount of the stockholders of the company was not obtained. Neither was such consent ever obtained to the sale made by the corporation to the Rozan Publishing Company. If the sale on January 14, 1928, is invalid then for the same reasons the sale to the Rozan Publishing Company was illegal. The referee, however, may not concern himself as to validity of the sale to the Rozan Publishing Company, for by the foreclosure of the chattel mortgage given back by that company to the Buffalo Telegram Corporation that company by bidding in the property acquired ownership, and the rights of the parties must be determined by the status existing on January 14, 1928, the date of the sale.

While the defendant corporation had certain investments of doubtful or uncertain value as the result of the operations of the Finance Corporation taken over by the consolidation of the constituent companies which formed the present corporation, nevertheless the practical operations and business of the Buffalo Telegram Corporation up to the time of the sale to the Rozan Publishing Company was confined to the publication of the daily paper, the *Telegram*, and to the doing of job printing. After the sale to the Rozan Publishing Company the Buffalo Telegram Corporation ceased to do any active business beyond the conserving of such financial interest it had for moneys due and owing it. After the company acquired back by foreclosure its former printing plant, it did not resume the operation of this plant, but leased it to others for a rental. Nevertheless it was in a position had its board of directors deemed it wise to have resumed the business which it formerly carried on.

It may well be the board of directors were of the opinion that such a course was inadvisable, and that for business reasons they deemed it better policy, or even a business necessity, to sell the plant owned by the company and wind up this branch of its business. We will assume that such was the case.

Nevertheless the question remains whether the directors acting for and on behalf of the company had the right and authority to make the sale attacked in this action without first obtaining the consent of two-thirds in amount of the stockholders of the company.

The statute seems to be quite explicit forbidding not only a sale of the entire property and franchises of the corporation, but also of " any interest therein or any part thereof." By its terms it would seem to cover such a plant as was owned by the Telegram Corporation. The decision of the Court of Appeals of this State in *Matter of Timmis* (200 N. Y. 177) we think controlling. In that case there was a sale of a branch of a corporation's business without the proper assent of stockholders, and it was held the fact the corporation lacked capital to carry on the department, and that " The sale was a business necessity " did not justify the company ignoring a compliance with the statute, and that such a sale was not a transaction within the ordinary course of the business of the corporation. As stated in *People* v. *Ballard* (134 N. Y. 269, 296): "All the authorities in this State are uniform in holding that the trustees of a corporation cannot so dispose of its property as to virtually end its existence and prevent it from carrying on the business for which it was incorporated. [Citing cases.]   *   *   * The fact that the trustees acted in good faith did not empower them to do an illegal act."

It is contended, however, by the defendants that under the declared purposes contained in the certificate of incorporation the directors of the company had the right and authority to make the sale in question. While the stated purposes are very broad and general the referee is unable to find in them the authority claimed. The 2d clause of the certificate in stating the purposes for which it is organized says: " To buy, sell, rent and exchange real property, improved and unimproved, to build, construct and alter buildings thereon and to manage and develop real property generally; to purchase, manufacture, acquire, hold, own, mortgage, pledge, lease, sell, assign, and transfer, to invest, trade, deal in and deal with goods, wares and merchandise and property of every kind and description, and to carry on any of the above businesses or other business connected therewith wherever the same may be permitted by law and to the same extent as the laws of the State will permit and as fully and with all the powers that the laws of the State confer upon corporations and organizations under this act and to do any and all the business above named and set forth to the same extent as natural persons might or could do."

It will be noted this declares the corporation may " *carry on any of the above businesses or other business connected therewith wherever the same may be permitted by law and to the same extent as the laws of the State will permit.*"

Consequently the business to be conducted is expressly made subject to the provisions of section 20 of the Stock Corporation Law. Indeed, had the certificate undertaken to exempt the company from the operation of State statutes such an exemption would have been illegal and void. Certainly the certificate just quoted does not justify the claim that it authorized the directors without the consent of stockholders to dispose of a substantial branch of its business or of the property necessary to conduct it.

This brings the referee to a brief reference to the case of *Wattley* v. *National Drug Stores Corporation* (122 Misc. 533), cited by counsel for the defendants.

In that case a Delaware corporation by its certificate of incorporation was authorized to purchase and sell and dispose of real and other property, and did sell one of a chain of stores in the city of New York, and it was claimed that the Delaware statute was violated in the sale of the particular store in question, but the court held this was done in the ordinary course of business of the company. This clearly distinguishes the *Wattley* case from that now in hand.

The referee is unable to reach any other conclusion than that the sale of the January fourteenth was unauthorized and illegal, and should be so declared. This brings us to the consideration of the

rights of the purchasers of the property under the sale. This is an equity action brought by a stockholder in behalf of himself, his fellow stockholders and for the benefit of the corporation itself. One seeking equity must do equity. The return of the property sold should be decreed, but as a condition the purchase price paid should also be returned, so the parties so far as possible should be placed in *statu quo*.

Practically all the property sold still remains in the building where it was before the sale was made. A few articles appear to have been sold by the purchasers. The purchasers sold to the defendant George Charnock the large printing press and its attachments and for this received $8,750. The final payment made by the purchasers to the Buffalo Telegram Corporation was made by a check of Charnock which was indorsed over to the company. Restoration can readily be made by the corporation by paying to Charnock the amount he paid, to wit, $8,750. The balance of the purchase price should be refunded to the purchasers.

It appears, however, that the purchasers have sold and disposed of in addition to the sale of the large press to Charnock certain other things to others. The amount so sold does not appear from the evidence given on the trial, but the value of such property so sold to others does not appear to be very great. It also appeared the purchasers also paid for the benefit of the Buffalo Telegram Corporation the sum of $400 for rental of the premises in which the plant is located. The purchasers should receive the benefit of such advance, and also account for the property sold to others than Charnock. Whether this will leave a balance in favor of the purchasers or in favor of the Buffalo Telegram Corporation the referee is unable to now determine. This can be only determined by a proper accounting for the property sold and disposed of, and the purchasers should render a detailed account so it may be ascertained.

So far as the defendant Charnock is concerned, he contends he bought the press and accessories referred to in good faith and without notice of any defect in the title to the same.

In a sense this may be true. That is he probably did not know that when the sale of January fourteenth was made it was done without the consent of stockholders and, therefore, illegal. Charnock, however, did know the plant sold was the property of the corporation and was sold in the manner it was by auction. The purchasers, however, got no legal title and could give no better title than they acquired. Charnock, however, should be protected so far as the circumstances of the case will permit. This can readily be done by directing in the decree a payment direct to Charnock

of the amount of his check turned over to the corporation in payment of the bid made by Burg and Dyker. It was Charnock's check indorsed to the Buffalo Telegram Corporation which went to make the final payment of the bid of $12,000 made by Burg and Dyker, and for this reason the $8,750 so paid by Charnock should be repaid directly to him. Let formal findings in conformity to these views be prepared for the signature of the referee.

So ordered.