**Sarah Edith Fisk, as Administratrix and Executrix of the Estate of Henry S. Fisk, Deceased, and in her Own Right, Appellant, v. Toys & Novelties Publishing Company and Porter-Spofford-Langtry Corporation, Appellees.**

**Gen. No. 34,183.**

Heard in the second division of this court for the first district at the April term, 1930. Opinion filed December 16, 1930. Rehearing denied December 30, 1930.

W. MORTON CARDEN and DICKINSON, SMITH, FARRELL & WHAM, for appellant; W. MORTON CARDEN and BENJAMIN WHAM, of counsel.

MUSGRAVE, OPPENHEIM & PRICE, for appellees.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On April 6, 1929, plaintiff filed her petition based upon the provisions of section 73, as amended in 1921, of the Illinois Corporation Act of 1919, against the two defendant corporations. Each filed a general demurrer to the petition after it had slightly been amended. The court sustained the demurrers and, plaintiff electing to stand by her petition, the same was dismissed for "want of equity," and she appealed.

In section 6 of the Corporation Act, as amended, Cahill's St. ch. 32, ¶ 6, it is provided in part:

"Each corporation organized under this Act shall, *subject to the conditions and limitations prescribed by this Act,* have the following powers, rights and privileges: . . .

(9) To lease, exchange or sell all of the corporate assets with the consent of two-thirds of all of the outstanding capital stock of the corporation at any annual meeting or at any special meeting called for that purpose; . . ."

In section 73 of the Act it is provided in part (Cahill's St. 1929, ch. 32, ¶ 73, p. 678):

"Any stockholder objecting to any action of the corporation in leasing, exchanging or selling *all* of its corporate assets, or objecting to a merger or con-

solidation with another corporation (the corporation acquiring such assets by lease, exchange, sale, merger or consolidation being hereinafter referred to as the 'acquiring corporation'), shall be obligated to sell and transfer to the acquiring corporation and the acquiring corporation shall become and be obligated to purchase such share or shares, together with all rights and interests thereby represented, including all cash or securities or other benefits accruing to such share or shares, from or by reason of the sale, lease, merger or consolidation at a price equal to the *fair value* of such share or shares with interest on such fair value at the rate of five per cent per annum from the date such sale, lease, merger, or consolidation was consummated. If such fair value and interest is not paid to such objecting stockholder by such acquiring corporation within thirty days after a mailing of notice thereof to the stockholder at his last known address as shown by the records of the corporation of such sale, lease, merger or consolidation, then such objecting stockholder may, within sixty days thereafter, file a petition in the circuit court of the county in which the principal office of the acquiring corporation is located, asking for a finding and determination of the *fair value* of such shares of stock. Upon the filing of such petition, the practice and procedure thereon shall be the same, so far as practicable, as that under the eminent domain laws of this State, but the court shall have full power and authority to do all things and enter all such orders as it may deem *equitable and just* for the purpose of preserving and protecting the rights of the parties of the proceeding during the pendency thereof. Such fair values shall be ascertained and determined as of the date of the consummation of such sale, lease, merger or consolidation, and without regard to any depreciation or appreciation because of or on account of such sale, lease, merger or consolidation.

"The court shall enter judgment against such *acquiring corporation* for the amount of such fair value, and interest thereon, which judgment may be collected as other judgments at law. Upon the payment of such judgment such stockholder shall cease to have any interest in such stock or in the property of the corporation. . . .

"Unless such objecting stockholder shall file such petition within the time herein limited, such stockholder and those claiming under him shall be conclusively presumed to have authorized, approved and ratified such sale, lease, merger or consolidation. If at the expiration of thirty days from the time of the consummation of such sale, etc., the person in whose name such share or shares shall stand shall not be living, . . . his executor or administrator . . . shall be entitled to file such petition within ninety days after the mailing of a notice thereof to the stockholder . . . of the consummation of such sale, lease, merger or consolidation."

On March 8, 1929, the defendants entered into a written agreement—the Toys & Novelties Publishing Company being referred to therein as the "Vendor" and the Porter-Spofford-Langtry Corporation as the "Vendee." In section 1 of the agreement the Vendor agrees to sell to the Vendee and the latter agrees to purchase, *for a consideration of $85,000,*

"The publications known as 'Toys & Novelties,' American 'Toy Manufacturer' and 'Buyers' Directory of American Toys'; the names *and the good will* in connection with said publications; and *all* such other assets as are a part of and *essential to the future business* of publishing said publications and any of them, such as copy-rights, trade-marks, advertising contracts, both active and expired, subscription contracts both active and expired, lists of advertisers and possible advertisers, lists of subscribers and possible sub-

scribers, manuscripts in hand or in process, all data, reports or records pertaining to the field of said publications, all cuts, electrotypes, photographs, library, files of correspondènce, stencils, stationery, and any and all such other records as are essential to said publications and each and every of them and their future issuance *as a going business;* also all office furniture and equipment and other articles of tangible personal property belonging to said Vendor, *except paper stock* ✓ *on hand.*"

And in section 1 it is stated that "no *accounts or* ✓ *bills receivable* of the Vendor shall be conveyed or assigned, and that the Vendor shall be given access at all times to any records and contracts essential to the collection of such accounts and bills receivable."

In section 2 the Vendor agrees to execute a bill of sale and assignment to the Vendee, and "The Vendee agreès, upon delivery to it of said bill of sale and assignment to pay to the Vendor the sum of $6,000 in cash to apply upon said purchase price, and to pay the remainder of said consideration, towit, $79,000, in ten annual installments of $7,900 each, payable respectively on the 20th day of March in each year from 1930 to 1939, both inclusive, and to pay interest at the rate of 6 per cent per annum on the whole amount remaining from time to time unpaid, said interest being payable semi-annually on September 20th and March 20th in each year . . . "

In section 3 provision is made for the execution and delivery by the Vendee to the Vendor, to secure the payment of the deferred payments, of certain described 6 per cent bonds, "to be secured by a trust indenture from the Vendee to Charles W. Spofford, as trustee." In section 4 it is provided: "The vendor shall pay all expenses pertaining to the February issue of 'Toys & Novelties' (now in the press) and shall be entitled to all income or proceeds therefrom. All ex-

penses accruing after March 1, 1929, including rent of the Vendor, pertaining to the publication of the said papers and publications above mentioned, except those specifically pertaining to said February issue of 'Toys & Novelties' and the collections relating to said issue, are assumed by the Vendee.''

In section 5 the Vendor agrees, in addition to making the assignments mentioned in section 2, that it will, upon demand of the Vendee, from time to time make any assignment of any specific contracts, rights and choses in action, deemed necessary or advisable by the Vendee, in order to convey to it ''the full right and title to matters above intended to be conveyed.'' In section 6 the Vendee ''assumes and agrees to carry out all pending, unexpired and unfulfilled advertising and subscription contracts for the purchase of paper, and to save the Vendor from any damage arising from any future breach thereof.'' The contract is signed in the name of the Vendor ''by Charles W. Spofford, president,'' and in the name of the Vendee ''by Fred D. Porter, president.''

In plaintiff's verified petition she sets forth a copy of said agreement as an exhibit and the same is made a part of the petition. She also sets forth the facts of the death of Henry S. Fisk (her husband) in New York City on January 4, 1928, her appointment as administratrix of his estate by a surrogate court there and her subsequent appointment as executrix of his will in which she was devised and bequeathed all of his property. She alleges in substance that the defendant, Toys & Novelties Publishing Company (hereinafter called the Toys Co.), is an Illinois corporation with principal place of business at 620 South Michigan Avenue, Chicago, and has a total capital stock of 1,000 shares of no par value, issued and outstanding; that heretofore it has been engaged in the business of publishing trade papers relating to the business of manu-

facturing and selling toys and novelties; that after the death of plaintiff's husband, upon the demand of the Toys Co., plaintiff, as administratrix and executrix, surrendered to it certain stock certificates which had been standing in the name of her husband, and received back in lieu thereof two other certificates of the company, viz., certificate No. 17 for 140 shares and certificate No. 18 for 100 shares, making a total of 240 shares of said stock of no par value; and that she is now the owner of said certificates and stock and "holds the same subject to the further order of this court."

And plaintiff further alleged that the defendant, Porter-Spofford-Langtry Corporation (hereinafter called the Porter-Spofford Co.) is also an Illinois corporation, with principal place of business in Chicago; that it was organized for the purpose of purchasing the assets and good will of the Toys Co., including the right to publish each and all of its said publications, and of retaining all profits derived from them; that Charles W. Spofford is now and at all times has been the owner and holder of 51 per cent of the outstanding capital stock of the Toys Co., and is its president and general manager; that he is one of the organizers and one of the stockholders, owning 50 shares, of the Porter-Spofford Co.; that on or about March 8, 1929, the two companies entered into a written agreement (referring to the agreement above mentioned); that plaintiff was first notified of the terms of the sale, as therein provided for, on March 15, 1929, when she received a copy of the agreement; and that prior thereto she "did not know the terms and conditions whereby said sale was effected." And plaintiff further alleged:

"15. That she is informed and verily believes that defendant Toys Co., has during the past seven years earned a total of $108,931.46; that because thereof its *average* earnings during said period have been $15,501.64; that during the past four years its average

annual earnings have been at the rate of $15,588.83; that a fair price for trade papers is in excess of twelve times their average annual earnings; that because thereof the good will and all of the remaining assets belonging to said defendant, except only cash on hand and cash due to it, is now and was on March 8, 1929, and for a considerable period prior thereto, worth at a fair price *in excess of $150,000,* the exact value of which plaintiff is not now aware.

"16. That immediately after she received notice that the defendant, Toys Co., had sold its assets and good will to defendant, Porter-Spofford Co., for the consideration and under the terms and conditions above stated, she notified both defendants that she objected to said sale and demanded of both of them that the purchase price to be paid and received by said defendants *be increased to an amount which would be fair and reasonable,* and that she be paid her *pro-rata* share thereof in cash, but that both defendants refused and failed to heed any of her demands and informed her that *unless this action was instituted* and they were ordered by this court to pay plaintiff a larger sum in cash, plaintiff would not be paid any larger sum, but would be paid her *pro-rata* share only as provided in said contract, and that same would not be paid to her until same was received under said contract by said Toys Co.

"17. That subsequent to March 8, 1929, and prior hereto, the defendant, Toys Co., declared and paid to plaintiff two dividends, one for $1,200 and another for $1,600, making a total of $2,800; that plaintiff is informed and verily believes that both of these dividends have been declared out of prior earnings of said defendant, and that no part of the same has been paid out of the funds received from said Porter-Spofford Co., as a part of the purchase price of said sale; and that plaintiff now holds, and will during the pendency

of this action continue to hold, said amounts subject to the further orders of the court.''

The prayer of the petition is (a) that the court fix the fair value of the good will and all the other assets formerly belonging to the Toys Co., excepting cash on hand and cash due to it on and as of March 8, 1929, and also fix the fair value of all of plaintiff's stock in said company as of that date; (b) that plaintiff have judgment against the defendant, Porter-Spofford Co., in the amount of the fair value of her stock as so fixed; and (c) that plaintiff have judgment against both defendants for her costs, etc., and that she have ''such other and further relief as this court may deem legal and equitable.''

Counsel for plaintiff contend in substance that, under the provisions of subsection 9 of section 6 and of section 73 of said Corporation Act, Cahill's St. ch. 32, ¶ 6 (subsection 9) and ¶ 73, and the allegations of said petition, plaintiff should be given an opportunity upon a trial to show the fair value of her stock, and that, if it should appear that such value is greater, proportionately, than said sale for $85,000 by the Toys Co. to the Porter-Spofford Co. would indicate, she should have the relief prayed for.

And counsel further contend in substance (a) that by the passage of subsection 9 of section 6 of said act a sale by a corporation, such as here appears, was made legal, which before and by common law was illegal and ultra vires (citing *Harding v. American Glucose Co.,* 182 Ill. 551, 631; *Abbot v. American Hard Rubber Co.,* 33 Barb. [N. Y.] 578; *People v. Ballard,* 134 N. Y. 269); (b) that, however, section 73 of the act was passed to protect the interests of minority stockholders when such a sale is made; (c) that the sections should be considered and construed together because they are in *pari materia;* and (d) that, although section 73 refers to a stockholder ''objecting to any action

of the corporation in . . . selling *all* of its assets," etc., and although it appears from the allegations of plaintiff's petition that the Toys Co. reserved from the sale certain paper stock, cash on hand and accounts receivable, still it should be held that it was the legislative intent in passing said section 73 that it should be applicable to such a sale as the present one, because by that sale the Toys Co. sold *substantially all* of its assets and such as were so integral a part thereof as to be essential to the transaction of its ordinary business.

The main contention of counsel for defendants is that the court properly sustained the demurrers because it appears on the face of plaintiff's petition that the Toys Co. did not sell to the Porter-Spofford Co. *all* of its assets and, hence, said section 73 is not applicable. Counsel argue that the word "all" in the section "means just what it says and is not open to construction."

We are not advised that the question, which is one not wholly free from difficulty, has been passed upon by our Supreme Court or by any of the Appellate Courts of this State. However, in the State of New York, there are somewhat similar statutes which have been considered by reviewing courts of that state. In *Matter of Timmis,* 200 N. Y. 177, it is decided in substance that the sale of "business, assets and property," *including the good will,* of an important "calendar" department or branch of the business of a New York corporation, organized to carry on the business of lithographing and printing, is not a transaction within the ordinary course of its business, and is valid only when made under and in compliance with the provisions of section 16 of the Stock Corporation Law of the State, authorizing the voluntary sale of the franchise and property of a corporation with the consent of two-thirds of its stockholders; and that, where such sale is made, a stockholder, voting against the resolu-

tion authorizing the directors to make the sale, is entitled under section 17 of said Corporation Law to an order for the appointment of three persons to appraise the value of his stock and directing the corporation to pay to him the value thereof as fixed by the appraisers. In the opinion of the court, after quoting parts of said sections 16 and 17, and referring to prior legislation and mentioning the cases of *Abbot v. American Hard Rubber Co., supra,* and *People v. Ballard, supra,* it is said (pp. 181–3):

"These cases and those which intervened established the law that a corporation cannot sell all its property, or *even a part thereof* so integral as to be essential for the transaction of its ordinary business, because such a sale is wholly or partly an act of self-destruction and a practical dissolution without compliance with law.

"The discussion of the subject in the various opinions suggested two evils: (1) The injustice to the bulk of the stockholders from want of power in a corporation to sell its business or an essential part thereof to another corporation organized for the purpose, frequently from its own membership, on terms deemed advantageous by the holders of a large majority of the stock. (2) The injustice to minority stockholders of requiring them to abandon, change or limit their business if the majority should have the power to direct such a sale. An incidental evil was the power of a dissenting stockholder to compel the majority to buy him out on his own terms in order to secure unanimous consent with no one left to question the transaction.

"These evils could be remedied only by legislation, . . . The act of 1893 is reproduced and amplified by sections 16 and 17 of the statute now in force. This legislation was designed to meet the evils pointed out by the courts by enabling a majority of two-thirds to sell if they deemed it was the best policy, and at the same time to protect the minority, if they regarded the sale as opposed to their interests. . . .

"The sale before us was not made in the ordinary course of the business of the corporation, for it was not organized to sell calendar departments, or any department that would involve going out of business *pro tanto,* . . . By the sale of the good will the corporation would be prevented from ever engaging in that kind of business again, and while not in form a sale of its franchise to that extent, it would be in effect, because it could no longer exercise its franchise to make and sell calendars. . . . Its own action would result in complete paralysis of every power required to conduct a calendar department and to this extent it would go out of business. Such a sale would, therefore, be corporate suicide to a certain extent, and to that extent a sale or abandonment of the charter. . . . The sale in question would not be valid without resorting to section 16, *and by resorting to that section the appellant opened the door for the respondent to enter and demand his rights under section 17.* . . .

"As the appellant availed itself of the privilege conferred by the statute, it must comply with the condition prescribed for the exercise thereof."

In the case of *In re Drosnes,* 175 N. Y. S. 628, decided by an appellate division of the Supreme Court of New York, Mary Drosnes, a stockholder holding one-third of the stock in the Film Amusement Co., Inc., made application for the appointment of three persons to appraise the value of her stock. The trial court denied her petition, but on appeal the order was reversed and the petition granted. It appears that said Film Co. was a New York corporation, which owned and operated a theater in New York City. In 1914, it altered the premises so as to comprise a theater and three stores, where only a theater had been before. Subsequently the stockholders, owning two-thirds of the stock, voted at a special meeting of the company, against petitioner's objection, to sell its interest in the theater to another amusement company. The sale,

afterwards consummated, did not include the ground lease covering the land upon which the theater was built, which was reserved to the Film Co. The defendants claimed on the hearing that the Film Co., after the sale, owned the same property as before, and that all that had been done was "to change the method of deriving its income from the property." The reviewing court in its opinion, for reasons given, held otherwise, and stated that the case "falls directly within the principles enunciated in *Matter of Timmis,* 200 N. Y. 177," and further said (p. 631):

"It is an obvious injustice to one who has invested in a third of the capital stock of a corporation, organized for the express purpose of operating a theater or place of amusement, to have the majority stockholders dispose of the only property it has which enables it to conduct a theater and transform its business into that of a mere landlord or lessor of stores and theaters. In the one case, there is the prospect and opportunity of large profits, growing out of the chance of acquiring plays that develop into great popular successes, while in the other the profits are absolutely limited to rents. So far as concerns the business for which this corporation was organized to perform, after thus stripping itself of its assets, it might as well have dissolved. But it is not proposed to dissolve it, but to hold the minority stockholders to their interest in the corporation and to such dividends as may be distributable from rentals. While the corporation law permits a corporation upon the consent of two-thirds of its stockholders to dispose of a substantial part of its assets, or even of all its assets, when it does so against the protest of the minority, it must comply with the conditions prescribed by the statute and buy the minority stock at its appraised value."

Reference is also made to the case in *Cole v. Wells,* 224 Mass. 504, from the opinion of which it appears

that the Massachusetts statute is very similar to said section 73 of the Illinois Corporation Act.

In view of the principles enunciated in the above cases we think that it should be held that it was the intent of the Illinois legislature, when it enacted the present Corporation Act and particularly subsection 9 of section 6 and section 73, that said section 73 should be applicable to such a sale as is alleged in plaintiff's petition, even though it appears that by the sale all of the assets of the Toys Co. were not conveyed to the Porter-Spofford Co. In *Louisville & Nashville R. Co. v. Industrial Board,* 282 Ill. 136, 139, it is said: "The intention of law-makers is to be gathered from the necessity or reason of the enactment and the meaning of the words, enlarged or restricted according to their real intent. In construing a statute the courts are not confined to the literal meaning of the words. A thing within the intention is regarded within the statute though not within the letter. A thing within the letter is not within the statute if not also within the intention. When the intention can be collected from the statute, words may be modified or altered so as to obviate all inconsistency with such intention. . . . The courts are bound to presume that absurd consequences leading to great injustice were not contemplated by the legislature, and a construction should be adopted that it may be reasonable to presume was contemplated." (See, also, *Anderson v. Chicago, B. & Q. R. Co.,* 117 Ill. 26, 28, 29; *Uphoff v. Industrial Board,* 271 Ill. 312, 315; *Ketcham v. Board of Education,* 324 Ill. 314, 317.) If the word "all" in said section 73 is to be given its literal meaning there would be little or no protection afforded to the rights of minority stockholders, objecting to sales under subsection 9 of section 6, which rights the legislature evidently intended to protect, for it would in such sales be an easy matter to reserve some small portion of the assets in the sell-

ing corporation and thereby completely destroy the rights of the objecting minority stockholders. And we think that the allegations of the petition in this case were sufficient to have warranted the trial court to have ruled defendants to answer the petition and to have a trial upon the merits. In the present case the demurrers were sustained and the petition dismissed "for want of equity." In *Seymour v. Woodstock & Sycamore Traction Co.*, 281 Ill. 84, 98, it is said: "A demurrer for want of equity cannot be sustained unless the court is, satisfied that no discovery or proof properly called for by or founded upon the allegations in the bill can make the subject matter of the suit a proper case for equitable cognizance." (See, also, *Coryell v. Klehm*, 157 Ill. 462, 473; *Wescott v. Wicks*, 72 Ill. 524, 526; *Smith v. Adcock*, 209 Ill. App. 277, 283.) It appears from the allegations of the petition that the contract between the two defendants provided for the sale of all the assets, including the good will, less those specifically reserved, of the Toys Co. to the Porter-Spofford Co., for $85,000, and plaintiff alleges in substance (petition par. 15) that on March 8, 1929, said assets, including the good will, were "worth at a fair price *in excess of $150,000.*" And it further sufficiently appears from the petition that the agreement of sale was consummated.

Other points are made by defendants' counsel as grounds for sustaining the demurrers to the petition. We have examined them and believe them to be lacking in substantial merit.

Our conclusion is that the circuit court erred in sustaining the demurrers to plaintiff's petition, and that the judgment against her should be reversed, and that the cause be remanded with directions to the circuit court to overrule said demurrers and to have a trial upon the merits. Such will be the order.

*Reversed and remanded with directions.*

SCANLAN, P. J., and BARNES, J., concur.