SANTA FE HILLS GOLF & COUNTRY CLUB, a Corporation, Respondent,

v.

SAFEHI REALTY COMPANY, a Corporation, Appellant.

No. 48536.

Supreme Court of Missouri,

Division No. 2.

Sept. 11, 1961.

Thos. J. Conway, Jr., William B. Bundschu, Kansas City, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel, for appellant.

Walter A. Raymond and Kenneth C. West, Kansas City, for respondent.

STORCKMAN, Judge.

The defendant, Safehi Realty Company, is the owner of a 56-acre tract of land located at 8600 Holmes Street in Kansas City which was improved and equipped as a golf and country club. The plaintiff, Santa Fe Hills Golf & Country Club, was in possession of the property under a written lease for a term of ten years expiring on December 31, 1959. The plaintiff claimed, and the defendant denied, that the defendant had made a valid extension of this lease for an additional five-year term. As a result of the controversy, the plaintiff filed this action in two counts, one for a declaratory judgment coupled with a request for injunctive relief, and the other for specific performance. The trial court found the issues in favor of the plaintiff. The defendant filed a motion for new trial which was overruled and in due course the defendant appealed. The plaintiff will sometimes be referred to as the Country Club and the defendant as the Realty Company.

The ten-year lease provided that, in the event the lessee held over after the expiration of the term, such holding over would not be deemed a renewal or extension but should be deemed a month-to-month tenancy at a rental equal to that of the last month. The Country Club remained in possession after December 31, 1959, and for six months continued to pay the rent provided by the lease. In May 1960 the Realty Company served notice of the termination of the tenancy as of June 30, 1960, on the theory that it was from month-to-month. On June 13, 1960, the Country Club filed this action and thereafter on July 11, 1960, the Realty Company filed in magistrate court a complaint in unlawful detainer which was enjoined by the decree in this

case. The Realty Company's evidence tended to prove that the reasonable rental of the real estate which accrued from June 30, 1960, to the time of trial was $21,750 in excess of the amount conceded by the Country Club to be due and owing under the lease. Therefore the amount in dispute, exclusive of costs, exceeds the sum of $15,000 and this court has jurisdiction. Art. V, § 3, Constitution of Missouri 1945, V.A.M.S.; § 477.040, RSMo 1959, V.A. M.S.; Merrill v. Davis, 359 Mo. 1191, 225 S. W.2d 763, 764 [1]; Veal v. City of St. Louis, 365 Mo. 836, 289 S.W.2d 7, 9 [1].

The trial court made findings of fact and conclusions of law and decreed that there was a valid extension of the written lease for a period of five years and the Realty Company was ordered to abide by the terms and conditions of the lease during that period of time. In general the contentions of the Realty Company on appeal are that the trial court erred in holding that its board of directors had authority to grant the lease extension made by it, in holding that the Realty Company ratified the lease extension, and in holding that it was estopped to deny the validity of the extension.

The testimony at the trial took a wide range and many exhibits were introduced in evidence, including the minute books of both corporations. It is unnecessary to recount all of the testimony and documentary evidence. Originally the property in question was owned by a fraternal organization and the golf course was used by a club consisting of members of the organization and associated bodies. The name of Inahove Realty Company, a Missouri corporation organized on March 23, 1935, was changed to Safehi Realty Company on March 28, 1945, at which time the capital stock of the corporation was increased from 20 shares of the par value of $100 each to 600 shares of the par value of $25 each. The Realty Company was the owner of the real estate in question in and after April 1945; it is the only real estate ever

owned by the Realty Company. The charter of the corporation authorizes it, among other things, "To transact and carry on the business of owning, handling, using and dealing in real estate, or any interest therein"; specifically included in the charter is the power to lease real estate. In April 1945 the Realty Company leased the property for a term of five years to the Country Club which is a corporation organized for the purpose of operating a golf and country club. Near the end of the first lease, the parties entered into a new lease for ten years with a termination date of December 31, 1959. During the years 1953 and 1954, the Country Club formulated plans for making extensive improvements on the property at its own expense which would enhance the value of the property. In view of the contemplated improvements which were of a permanent nature, the Country Club sought an extension and other modifications of the then existing ten-year lease.

Apparently the first recorded activity regarding proposed improvements and a lease beyond December 31, 1959, occurred at the annual meeting of the shareholders of the Realty Company held on January 11, 1954. The minutes of this meeting contain this statement:

"The President and several committee chairmen of the Santa Fe Hills Golf and Country Club then visited the Directors' Meeting, and presented drawings and discussed plans for a remodelling of and addition to the Club-house, which they asked our directors to consider, with a view to having the Safehi Realty Company finance the construction, with a new lease being drawn up to run for approximately sixteen years (ten years beyond the expiration of the present lease), with monthly rental payments being revised upward to take care of the construction expenditure.

"The matter was discussed at considerable length, with the visitors being told that their plans looked very good, but that the Safehi Realty Company would have to borrow the entire amount of funds necessary for such construction, so that all that could be done at this time was to promise that the matter would be given full consideration."

At a special meeting of the directors of the Realty Company held on February 22, 1954, a resolution was unanimously adopted authorizing Paul L. Taylor, president of the company, to write a letter offering the Country Club, among other things, "a five year extension to the present lease which has six years yet to run." The directors of the Realty Company and the number of shares owned by each of them during 1954 were: D. A. Johnson, 156 shares; Paul L. Taylor, 150 shares; W. C. Vogt, 30 shares; Paul Baird, 12 shares; and D. A. MacDougall, 6 shares. Thus the five directors together owned 354 shares of the 600 shares outstanding according to the list of shareholders attached to the minutes of the annual shareholders' meeting held on January 11, 1954. Mr. Johnson and Mr. Vogt did not attend the special directors' meeting on February 22, 1954, and the Realty Company claims they had no notice of it and that the meeting was therefore not legally constituted.

In response to a letter, evidently written in accordance with the resolution adopted by the Realty Company's directors on February 22, 1954, the president of the Country Club, on March 29, 1954, wrote to Mr. Taylor saying: "This is to formally acknowledge receipt of your letter of February 23, 1954 wherein the directors of the Safehi Realty Company agreed to an extension in the lease of five (5) years beyond expiration of the present lease in accordance with the terms of the existing lease. We wish to accept this extension; but we believe that the present lease should be modified now to our mutual advantage." The letter further stated that some of the points that should be clarified in a new lease involved the chattel lien held by the Realty Company on the furniture, fixtures

and equipment of the Country Club, a provision covering water line breakage and damage, and a change in the method of paying insurance premiums and taxes. The minutes of a special meeting of the board of governors of the Country Club held on June 24, 1954, recited that the board did not favor extending the lease without these and other modifications specified in the minutes.

There was further correspondence between the parties during 1954 and 1955. In its letter of April 7, 1954, the Realty Company discussed the modifications suggested in the March 29 letter of the Country Club, accepted one and rejected the others, and further stated: "Regarding the modification of the lease, we feel that the five-year extension was made on the lease, and that it is a very beneficial lease for all concerned." On September 15, 1954, the Country Club wrote the Realty Company, referred to "recent conversations", and stated: "The thought occurs to me that we should either rewrite or amend our lease agreement, in accordance with the various correspondence between Mr. Rhodes and you, commencing March 29, 1954, and my last letter of July 23, 1954. Our attorneys, Mr. Dean Frazier and Mr. Wm. Wade, both of whom are club members, would be glad to assist in this respect if you so desire." On September 30, 1954, the Country Club again wrote the Realty Company enclosing copies of proposed mailings to members of the Country Club regarding the improvement program which included items concerning the grounds and greens, the clubhouse, a new swimming pool and the financing of the program by the members of the club. Further the letter asked for the Realty Company's comments and suggestions on the matters mentioned in the Country Club's letter of September 15. In letters of October 5 and October 19, 1954, the Country Club reported on the progress of the improvement plans and requested a "firm agreement in writing concerning various terms of the lease agreement".

On March 21, 1955, Mr. Baird, secretary of the Realty Company, wrote to Mr. Hoover, president of the Country Club, saying:

"At a recent meeting of the officers of the Safehi Realty Company, it was decided that the present lease was considered adequate, and that no changes would be made at this time, an extension of five years would be granted at the expiration of the present lease which expires December 31, 1959, and the rate of rent would be the same as at present.

"If it is ever decided to offer the property for sale, the present lease holders will be granted first chance to purchase the property."

On March 23, 1955, Mr. Wade, attorney for the Country Club, wrote to Mr. Baird:

"At the request of Mr. Arlo Hoover and the other officers of Santa Fe Hills Golf & Country Club, I am hereby advising you that the Santa Fe Hills Golf & Country Club accepts the extension of five years to be granted at the expiration of the present lease, which expires December 31, 1959, at the same rate of rent as at present, and we also accept Safehi's offer to us of first chance to purchase the leased property if same is ever offered for sale.

"We regret that the officers of Safehi Realty Company did not deem it advisable to further amend the lease in line with the other request discussed with them by the Board of Governors; however, the changes agreed to above will enable us to proceed with our improvement program."

At the next regular meeting of the Realty Company's board of directors held on January 9, 1956, all five directors were in attendance, including D. A. Johnson. The minutes of this meeting recite that "The Board ratified the extension, of the

present lease for five years at the same rate which was accepted." Mr. Johnson admitted that he was present at this board meeting but denied that there was any discussion of the ratification of the extension of the lease.

Following the exchange of letters between the parties in February and March 1954, the Country Club proceeded with its program of improvements and the raising of necessary funds from its members. Early in October 1954, the president of the Country Club issued a circular to the members relative to the three-year improvement program which referred to "the extended period of our lease, which now runs for 10 years, or, December 31, 1965, with extension option privileges." This circular details the improvements and their cost and is practically identical with that submitted by the Country Club's president to the Realty Company in his letter of September 30, 1954, previously referred to. Publicity of the improvement program was given in various ways, such as by exhibiting photographs and drawings of it in the lobby of the clubroom, by news stories in the Kansas City Star and Times, and by announcements in the Country Club's paper called the Divot Digger which was sent to all members every couple of months. The evidence tended to prove that between November 1954 and October 1956 the Country Club made improvements on the property totaling $66,833.42. In 1959 it spent $4,202.21, and in the first six months of 1960, $1,633.72 for such purposes.

The evidence showed that a close relation existed between the members, the shareholders and directors of the two corporations. The registered office of Safehi Realty Company was at 8600 Holmes Street in Kansas City which was the clubhouse of the Country Club. The ten-year lease also designates this as the Realty Company's principal office. Notice of meetings, as well as the minutes in a great many instances, disclose that the meetings of the Realty Company's shareholders and direc-

tors were held at the clubhouse as were the meetings of the board of governors of the Country Club. In a number of instances, shareholders and directors of the Realty Company were members of the Country Club.

The chief objector to the lease extension was D. A. Johnson, a director and shareholder of the Realty Company. There was testimony that his principal objection was that the rent paid by the Country Club was not adequate. Mr. Johnson testified that he was not notified of the directors' meeting of February 22, 1954, at which the extension of five years was authorized and that he did not have any knowledge of an extension until 1956. This knowledge came to him when he saw a copy of the letter written by Paul Baird, secretary of the Realty Company, to Mr. Hoover, president of the Country Club. He testified that he attended the shareholders' meeting in January 1956 and brought up the matter at that time. He put through a motion to change the bylaws so that the board of directors would not have the power to either sell or lease the corporation's assets without permission of the shareholders, but this change does not appear in the corporate minutes until those of the January 1957 meeting of shareholders. Prior to that the restriction had been on selling only. At this same shareholders' meeting in January 1957, the board of directors was authorized to make a loan to the Country Club if the occasion arose and it appeared that such a loan would be to the best interests of the corporation.

No formal document was executed by the parties evidencing the extension of the lease. On the other hand, no effort was made by the shareholders or directors to correct the corporate minutes of the Realty Company, if they were erroneous, or to set aside or repudiate the action of its board of directors in purporting to authorize the five-year extension at the special meeting of February 22, 1954, or the ratification evidenced by the minutes of the

regular meeting held January 9, 1956, if unauthorized.

In December 1959, or the early part of 1960, the Great Western Home Building Company purchased the shares of the capital stock of Safehi Realty Company owned by Mr. Johnson, Mr. Taylor and others, thereby becoming the owner of the majority stock of the Realty Company. At the time of the trial the Building Company owned 426 of the 600 shares outstanding. Mr. Ira K. Witschner, president of the Great Western Building Company, was elected a director of the Realty Company at the annual shareholders' meeting on January 11, 1960. The minutes of this meeting also has this entry: "A general discussion ensued concerning the status of current lease extension to Santa Fe Hills Golf and Country Club, as well as the probable future of the Club because of rumors circulating as a result of the purported sale of a majority of the outstanding shares. Mr. Witschner contended the present lease extension was invalid based upon a Missouri statute. Mr. Hoover questioned the statement. Mrs. Madeline Taylor stated there was no doubt in her mind that a lease extension of 5 years was negotiated by both parties in good faith, extending through 1964." At the trial Mr. Witschner testified that he had knowledge of the alleged lease extension before his company purchased the stock, that he told Mr. Taylor there would be a legal problem and possibly a lawsuit so it was agreed that 29 per cent of the purchase price would be paid down, that interest only would be paid for five years and thereafter the balance of the purchase price would be paid in equal payments over a period of five years. As the result of special meetings of the shareholders and the directors of Safehi Realty Company held on May 6, 1960, legal counsel was retained for the purpose of terminating the tenancy of the Santa Fe Hills Golf and Country Club and obtaining possession of the real estate in question. This litigation followed.

■ One attack upon the validity of the lease extension is that the special meeting of the defendant's board of directors held on February 22, 1954, was not legally constituted in that directors Johnson and Vogt were not present at the meeting and Johnson, at least, was not notified that the meeting was to be held. The defendant cites Brinkerhoff Zinc Co. v. Boyd, 192 Mo. 597, 91 S.W. 523, 526, which holds that an action taken by members of a corporate board of directors separately and not at a meeting was void. In this case, however, a quorum was present at the meeting and the question is whether the other members of the board were notified. A bylaw of the corporation provides that: "Special meetings of the Board may be called by the President on one day's notice to each director either personally or by mail or telegraph." If a meeting of a board of directors of a corporation is held and a quorum is present, it will be presumed in the absence of evidence to the contrary that proper notice was given and that all necessary steps were taken to constitute it a regular and valid meeting of the board. Gate City National Bank v. Elliott, Mo., 181 S.W. 25, 28; Feld v. Roanoke Investment Co., 123 Mo. 603, 27 S.W. 635, 638.

■ Mr. Johnson testified that he was not notified of the meeting, but others testified that notice was given. In reviewing evidence on appeal in an equitable action or in cases tried upon the facts without a jury, the appellate court will give due regard to the opportunity of the trial court to judge the credibility of the witnesses. S.Ct.Rule 73.01(d), V.A.M.R.; § 510.310 subd. 4, RSMo 1959, V.A.M.S.; Spitcaufsky v. Guignon, Mo., 321 S.W.2d 481, 489 [7]; Glauert v. Huning, Mo., 266 S.W.2d 653, 662 [1]. We find no error in the court's disbelieving, as it apparently did, the testimony of Mr. Johnson. In these circumstances there was evidence from which the court could properly find,

as it did, that notice of the special meeting was given to all of the directors.

■ Section 351.310 of our statutes provides: "The property and business of a corporation shall be controlled and managed by a board of directors * * *." The bylaws of the Realty Company provide that: "The property and business of this corporation shall be managed by its Board of Directors—five (5) in number—* * *." Where the management and control of a corporation is vested by statute and the corporate bylaws in the board of directors, the board's action with respect to the affairs of the corporation is controlling and exclusive, and the shareholders are without lawful authority to control the directors in the exercise of the judgment vested in them. Merrill v. Davis, 359 Mo. 1191, 225 S.W.2d 763, 768 [5]; Grafeman Dairy Co. v. Northwestern Bank, 290 Mo. 311, 235 S.W. 435, 440–441 [2]; Beveridge v. New York El. R. Co., 112 N.Y. 1, 19 N.E. 489, 494, 2 L.R.A. 648. Consequently, the defendant's board of directors was vested with authority to grant the five-year extension unless, as the defendant contends, the board's authority was restricted by § 351.400. Section 351.400 provides that a sale, lease, or other disposition of all or substantially all the property and assets of a corporation "if not made in the usual and regular course of its business" may be made on the authority of the affirmative vote of at least three-fourths of the outstanding shares entitled to vote at a meeting of shareholders called for the specific purpose of considering such sale, lease or other disposition. Before such proposal is considered by the shareholders, the directors are required to adopt a resolution recommending it and directing that the matter be submitted to the shareholders. Section 351.405 provides that, in the event "a sale or exchange of all or substantially all of the property and assets of a corporation, otherwise than in the usual and regular course of its business, is authorized by a vote of the shareholders of the corporation", a dissenting shareholder may require the payment to him of the fair value of his shares upon his following the procedures set out in the section.

Although there was evidence that the original five-year lease and the ten-year lease were both approved by the shareholders, such action does not appear to have been taken in an attempt to comply with § 351.400 because the procedure outlined in the statute was not followed. A corporation's internal policy or practice is not determinative of the intent and meaning of the statute. Specifically, the Realty Company urges that the five-year extension was a lease of all or substantially all of its property and assets "not made in the usual and regular course" of its business. It asserts that the usual business of the company was the collection of rents, making payments of the company's mortgage obligation, sending out notices of meetings and seeing that all of the taxes were paid at the right time. Obviously these items are purely administrative acts incidental to the lease of its land and they do not adequately describe the essential nature of the business.

Our statutes, §§ 351.400 and 351.405, appear to be modeled after Smith-Hurd Illinois Annotated Statutes, Chapter 32, §§ 157.72 and 157.73. For an interpretation of its statutes, the Illinois courts have relied on In re Timmis, 200 N.Y. 177, 93 N.E. 522, decided by the New York Court of Appeals in 1910. In the Timmis case a lithographing and printing corporation operated a calendar department, the business of which was to obtain orders and create a demand for calendars and other advertising specialties. The company sold the calendar department but refused to pay a dissenting shareholder the appraised value of his stock. The court held that the sale was not made in the ordinary course of the company's business because it was organized to sell calendars, not to sell calendar departments. The court stated, 93 N.E. 522, 523: "These cases and those which intervened establish the law that a corporation cannot sell all its property, or even a part thereof so integral as to be

essential for the transaction of its ordinary business, because such a sale is wholly or partly an act of self-destruction and a practical dissolution without compliance with law." See also Fisk v. Toys & Novelties Publishing Co., 259 Ill.App. 368, 377; Stiles v. Aluminum Products Co., 338 Ill. App. 48, 86 N.E.2d 887; In re Drosnes, 187 App.Div. 425, 175 N.Y.S. 628, 630; Kaszubowski v. Buffalo Telegram Corporation, 131 Misc. 563, 227 N.Y.S. 435, 440.

Hendren v. Neeper, 279 Mo. 125, 213 S.W. 839, 840, 5 A.L.R. 927, was a suit by a minority of the board of directors of a land company to restrain the majority from selling about 2800 acres of land. The refusal of the trial court to grant the injunction was affirmed on appeal. This court held: "Its charter powers expressly authorize it to buy and sell real estate—in fact recites that the corporation was formed for that purpose. The sale of the land in question has no reference to the destruction of the corporation, it is merely carrying out the specific charter power the corporation possesses. Nor is there anything in the record that disclose any attempt or desire, in making this sale, upon the part of the majority of the directors to interfere with the integrity of the corporation." This seems to be the kind of transactions comprehended by statutes such as § 351.400.

Section 351.400, enacted in 1943, supplanted § 5042, Mo.R.S.A.1939, which required that "three-fourths of all the voting stock of such corporation shall be voted in favor of such proposition to sell or otherwise dispose of the corporation's assets." In some respects the new law relaxed the means by which all or substantially all of a corporation's property and assets could be sold or otherwise disposed of, but it added provisions for the protection of dissenting shareholders. Nevertheless, the type of transaction within the purview of the act seems to be substantially unchanged.

In addition to the cases already discussed, three other cases cited by the Realty Com-pany should be mentioned. Palmer v. Hoffman, 318 U.S. 109, 115, 63 S.Ct. 477, 481, 87 L.Ed. 645, holds that " 'regular course' of business must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business." The Palmer case was considering whether business records were made "in the regular course" of business so as to be admissible in evidence. On this point it was cited with approval in Kitchen v. Wilson, Mo., 335 S.W.2d 38. The Palmer case is helpful but not controlling as to the meaning of § 351.400. In Shell v. Conrad, Mo.App., 153 S.W.2d 384, at a meeting of "some of the stockholders", those present undertook to dispose of all of the assets of the corporation. The court held the meeting was not called as provided by law and that the pretended transfer of the assets was void. In Grafeman Dairy Company v. Northwestern Bank, 315 Mo. 849, 288 S.W. 359, a deed of trust was held insufficient to convey title to the real estate because the deed of trust was executed without authority of either the board of directors or the shareholders of the company. The Shell and Grafeman cases are not decisive of the precise point here involved.

Hendren v. Neeper and In re Timmis, and the cases that have followed them, give the best clue to the legislative intent of the phrase "if not made in the usual and regular course of [the corporation's] business" as used in § 351.400. The Palmer case couples regular course of business with "the inherent nature of the business" and "the conduct of the business as a business." In re Timmis speaks of property "so integral as to be essential for the transaction of its ordinary business" and of a sale that constitutes "an act of self-destruction and a practical dissolution." Hendren v. Neeper refers to "the destruction of the corporation" and an attempt or desire on the part of the directors "to interfere with the integrity of the corporation." By express statute, the board of directors is vested with the management and control of the business

of a corporation in its usual and regular course. We are not called upon to decide to what extent such authority may be restricted by a bylaw of the corporation because no such bylaw existed at the time in question. We conclude that the type of transaction contemplated by § 351.400 is one that tends to interfere with the integrity of the corporation and to impair its capacity to perform its functions as a going concern.

■ In determining the scope and application of § 351.400 in this case, we are concerned only with the usual and regular course of the *corporation's business* not with any practice or custom between the directors and shareholders within the corporation. The leasing of the 56 acres of land was a part of the usual and regular business of the Realty Company as evidenced by its charter powers and the lease of the land for previous successive terms of five and ten years and to the same lessee. The extension of the lease for a term of five years was in the usual and regular course of the *corporation's business* and was not in violation of § 351.400. We are not called upon to decide what sort of lease by reason of its duration or other terms might violate the statute and we express no opinion in that regard.

The Realty Company also contends that the lease extension was in violation of "the Company by-law or resolution adopted January 14, 1946." On this date the shareholders by resolution provided that "no sale of all or any part of the land" belonging to the company may be made except with the approval of a majority vote of the entire outstanding capital stock. The resolution did not provide that it should become a part of the bylaws, and one set of bylaws in evidence, plaintiff's Exhibit 24, which is attached to a list of shareholders, dated December 31, 1955, does not contain any such bylaw. At the annual meeting of the shareholders, held on January 14, 1957, Section 8, Art. IV, of the bylaws, was amended so as to deny the authority of the directors to lease the property of the Realty Company

without the approval of the shareholders as well as to sell it. The Realty Company's position is that the lease extension in question was a "sale" within the meaning of the resolution adopted January 14, 1946. Warner v. Fry, 360 Mo. 496, 228 S.W.2d 729, cited by the Realty Company, held in a personal injury action that a lessor, as a general rule, is not under any obligation to repair because a lease is regarded as equivalent to a sale of the premises for the term of the lease. McConnell v. Columbia Company, 326 S.W.2d 20, the Court of Civil Appeals of Texas held in an action for a real estate commission that a lease transaction was a sale of real estate within the meaning of a statute making a writing a prerequisite to the recovery of a commission for the sale of realty. Chaney v. Whitney, 107 So.2d 471, the Court of Appeals of Louisiana held in an action for rent that a lease is similar to a sale as there are three absolutely necessary essentials to each—the thing, the price, and the consent. Nothing in these cases convinces us that "sale" as used in the resolution of January 14, 1946, was intended to include a lease.

■ Ordinarily a sale is the transfer of ownership of property which includes title as well as possession or the right to it, while a lease grants only the use and enjoyment of property for a limited term. 51 C.J.S. Landlord and Tenant, § 202(4), p. 808; Moorshead v. United Rys. Co., 119 Mo.App. 541, 96 S.W. 261, 272; Loud v. St. Louis Union Trust Co., 313 Mo. 552, 281 S.W. 744, 755[3].

■ Words must be taken in their plain or ordinary and usual sense unless there is something in the context that compels a different meaning. Section 1.010, RSMo 1949, V.A.M.S.; Steggall v. Morris, 363 Mo. 1224, 258 S.W.2d 577, 582[12]. We find nothing in the context or the circumstances of the case to justify our saying that the word "sale" was intended to include a lease of the land. There was no viola-

tion of the bylaw or resolution, and the assignment is denied.

The extension of the lease for a term of five years was authorized by the board of directors at its meeting on February 22, 1954. The Realty Company communicated this offer to the Country Club in accordance with the resolution and the offer was never withdrawn. The Country Club accepted the extension on March 29, 1954, but continued its efforts to get the Realty Company to agree to more favorable terms in other respects. These further negotiations were of little or no avail and, on March 21, 1955, the Realty Company, with a note of finality, notified the Country Club that it considered the present lease was adequate and that no changes would be made beyond granting the five-year extension. On March 23, 1955, the Country Club's attorney wrote the Realty Company at the request of the Club's president accepting the five-year extension and expressing regret that the Realty Company did not deem it advisable to amend the lease in other respects. This would seem to be sufficient to constitute an agreement for the extension but if there were any doubt it was resolved by the action of the Realty Company's board of directors in ratifying the extension at its regular board meeting on January 9, 1956.

On this date an entry in the minutes of the board meeting states that the board "ratified the extension of the present lease for five years at the same rate which was accepted." This could only refer to acceptance by the Country Club as referred to above. The Realty Company attacks the force and effect of this minute entry, chiefly on the basis of the testimony of Mr. D. A. Johnson, a director and shareholder. He testified that the matter of the extension was not discussed and was never brought up at the directors' meeting, although he admitted it was discussed at the shareholders' meeting which immediately preceded the directors' meeting. There was other evidence that the matter was discussed and acted upon at the directors' meeting and that Mr. Johnson's only objection was, as it had been previously, that the rental was not enough and should be increased.

A corporation is required by law to "keep minutes of the proceedings of its shareholders and board of directors". Section 351.215, RSMo 1949, V.A.M.S. Minutes of the proceedings of the board of directors of a corporation are generally admissible as prima facie evidence of what occurred at such meeting. Thadeus Kosciuszko Soc. v. Polish Home Ass'n, Mo.App., 218 S.W.2d 811, 813[1]; State ex inf. Mansur ex rel. Fowler v. McKown, 315 Mo. 1336, 290 S.W. 123, 128[12]; State ex rel. Grimm v. Manhattan Rubber Mfg. Co., 149 Mo. 181, 50 S.W. 321, 330[16]; Madden v. Paroneri Realty Co., 75 Mo.App. 358, 362; 18 C.J.S. Corporations § 191 e, p. 612; 32 C.J.S. Evidence § 699, p. 593. Beyond this we need not go. The testimony of Mr. Johnson as we read it in the transcript is not impressive and we find no fault in the trial court's giving it little or no weight or value. The court did not err in finding that the minute entry correctly reflected the action taken by the board of directors.

If the acts of the Realty Company's officers and agents in offering the lease extension had been unauthorized, the action of the board of directors on January 9, 1956, would have constituted a ratification because there can be no doubt that the directors, as well as the shareholders, had full knowledge of all the material circumstances by that time. See In re Farmers' Exchange Bank of Gallatin, 327 Mo. 640, 37 S.W.2d 936, 942; Washington Savings Bank v. Butchers' & Drovers' Bank, 107 Mo. 133, 17 S.W. 644, 646. In any event, the minute entry was competent evidence of the authorization by the board of the lease extension and its consequent validity.

The last two points in the appellant's brief relate to the trial court's finding that the Realty Company was estopped to deny the validity of the lease extension. In view of our conclusion that the extension is valid and binding in that it was authorized and

ratified by the board of directors, it is unnecessary for us to consider the question of estoppel. All other questions properly presented have been considered and decided adversely to the appellant.

The judgment is affirmed.

All concur.