**Sid SITEMAN, Plaintiff-Appellant-Respondent,**

**v.**

**MARINE PETROLEUM CO., Defendant-Respondent-Appellant.**

**Nos. 35166, 35167.**

Missouri Court of Appeals,
St. Louis District,
Division Two.

May 21, 1974.

Motion for Rehearing or Transfer to Supreme Court Denied June 12, 1974.

On Motion to Substitute July 5, 1974.

Cook, Murphy, Lance & Mayer, St. Louis, for plaintiff-appellant-respondent.

Husch, Eppenberger, Donohue, Elson & Cornfeld, Myron Gollub, St. Louis, for defendant-respondent-appellant.

CLEMENS, Acting Presiding Judge.

Plaintiff Sid Siteman, formerly president and general manager of defendant Marine Petroleum Company, sued in separate counts for a stipulated salary of ten per cent of defendant's net profits for five fiscal years. On plaintiff's Count IV the trial court sitting without a jury awarded plaintiff $81,065 plus $29,589 interest for the first fiscal year 1965–1966 during which he actively served Marine, and Marine has appealed. The trial court denied plaintiff's salary claims for the following four fiscal years after Marine had dismissed plaintiff (Counts I, II, III and V) and plaintiff has appealed from that part of the judgment.

In 1946 and 1947 the Siteman and Kopolow families discussed the formation of an oil storage terminal operation to facilitate the petroleum marketing businesses of each family. The Kopolows owned the Mars Oil enterprises and the Sitemans owned and operated the larger Flash and Site oil operations. Plaintiff Sid Siteman then managed Mars and his brother Phil managed Flash and Site. Marine was incorporated in 1947. The new corporation was owned half by the Sitemans and half by the Kopolows. As planned, Marine obtained the patronage of each family's firms for its new terminal.

Marine's first board of directors met in October, 1947 and adopted this resolution: "It was regularly moved and seconded that Mr. Sid Siteman be the General Manager of the Company; he, however, to consult with Mr. Phil Siteman on all major problems, and that, for his services as General Manager of this Company, he be paid as salary an amount equal to ten per cent (10%) of the net profits of the Company before taxes, said salary to be paid *at the end of each fiscal* year and as soon as the net profits are determined, Motion carried unanimously." (Our emphasis).

At the beginnings of the second to seventeenth fiscal years the directors adopted similar resolutions. At the eighteenth and nineteenth annual board meetings held in September, 1964 and 1965 similar resolutions were adopted, differing only in the two emphasized words: "It was regularly moved and seconded that Mr. Sid Siteman, as *President* and General Manager of the Company, be paid a salary of ten per cent (10%) of the net profits of the Company before taxes, said salary to be paid at the end of *the* [not each] fiscal year and as soon as the net profits are determined . . . ."

### Defendant Marine's Appeal

We treat the appeals separately, dealing first with Marine's appeal from plaintiff's judgment on Count IV for his fiscal 1965–1966 salary. The issues are whether for that fiscal year (1) plaintiff proved Marine's salary promise, (2) plaintiff proved he performed as Marine's general manager and (3) whether the term "net profits" was limited to Marine's operating profits or also included a large gain Marine made on the sale of its original terminal. These in order.

Plaintiff relies on Marine's September 20, 1965 resolution, *supra,* to show it promised to pay his 1965–1966 salary. Since 1953, its first profitable year, Marine has regularly paid plaintiff ten per cent of its profits earned in each fiscal year, including 1964–1965. At the next meeting of Marine's board of directors, September 19, 1966, plaintiff's status as Marine's president was unchanged. Despite the September 1965 resolution, however, Marine did not vote to pay plaintiff a salary for fiscal 1965–1966. This failure gave rise to plaintiff's demand for ten per cent of Marine's $810,658 profit for the 1965–1966 fiscal year.

As said, Marine challenges both the existence of an employment contract for 1965–1966 and plaintiff's performance.

By his claim for that salary plaintiff pleaded it was agreed to by an express, oral and bilateral contract, and Marine contends that was not proven. Marine stresses plaintiff's evidence offered on his other counts—I, II, III and V—to support his alternate contention he had a life-time employment contract. Marine contends it is inconsistent for plaintiff to contend he had both an employment contract of indefinite duration and also had one for a specific one-year period. This overlooks the fact that plaintiff's Count IV plea for the one-year salary is in the alternative and hence not defeated by his other contention that since 1947 he had a non-terminable contract of indefinite duration. We hold that by Count IV plaintiff did plead a one-year employment contract.

Marine challenges the sufficiency of evidence to establish the pleaded one-year contract. Plaintiff relies primarily on Marine's corporate minutes of September 20, 1965 stating that plaintiff "as President and General Manager of the Company, be paid a salary of ten per cent (10%) of the net profits to be paid at the end of the fiscal year and as soon as the net profits are determined . . . ."

Corporate minutes are "prima facie evidence of what occurred at such meeting." Santa Fe Hills Golf and Country Club v. Safehi Realty Co., 349 S.W.2d 27 [10–12] (Mo.1961). We hold the quoted minute entry of September 20, 1965 evidenced Marine's promise to pay plaintiff ten per cent (10%) of its net profits for the fiscal year just then beginning.

Marine contends plaintiff failed to show and express acceptance and therefore the contract lacked mutuality. "Mutuality of obligation is not necessary if there is consideration other than a promise." Schmidt v. Morival Farms, 240 S.W.2d 952[5] (Mo.1951). By plaintiff entering upon the duties of Marine's president and general manager, and by Marine's accepting those services, the mutuality requirement

was fulfilled and no express acceptance of Marine's employment promise was necessary; it would have been redundant.

■ Marine also challenges plaintiff's performance of the employment contract. The record is barren of any evidence of specific services plaintiff was required to perform for Marine and also devoid of corporate objections about what functions plaintiff allegedly failed to perform. In the early years of Marine's venture plaintiff performed not only executive functions but also routine management chores such as purchases, transportation, warehousing and sales. As Marine grew plaintiff gradually shifted those and other functions to his brother-in-law, Myron Kopolow, who in 1967 succeeded plaintiff as Marine's president and general manager.

Over the years from 1947 to 1966 Marine flourished. Its net worth skyrocketed from $20,000 to over a million dollars and its annual net operating profits grew from nothing to over $68,000. By 1966 plaintiff was still handling some major executive duties: He kept abreast of Marine's financial affairs, dealt with brokers and purchased securities, took part in the sale of the original terminal and in buying the site for a new terminal and regularly discussed policy matters with Myron Kopolow. At all times plaintiff was ready and willing to continue those functions.

Although there was conflicting testimony as to just what plaintiff did for Marine, the trial court found that during the year in question plaintiff "stood ready to perform and did perform all of his necessary duties as president and general manager of Marine." This finding was not clearly erroneous. Rule 73.01(d), V.A.M.R.

Having determined Marine's promise and plaintiff's performance we hold he was entitled to recover on his Count IV and we now consider the proper amount thereof— particularly whether "net profits" embraced the $720,190 gain on the sale of Marine's original terminal. The trial court, in computing plaintiff's ten per cent salary for fiscal 1965–1966, considered that gain as part of Marine's net profits. We explore the meaning of "net profits."

" 'Profit' is an elastic and ambiguous word." 34 Words and Phrases, page 405. In Sidney Smith, Inc. v. Steinberg, 316 S. W.2d 243[3] (Mo.App.1958), the court adopted Webster's definitions of "profit" as "the excess of returns over expenditure in a given transaction or a series of transactions; as: a. The excess of the price received over the price paid for goods sold. b. The excess of the price received over the cost of purchasing and handling, or of producing and marketing, particular goods * * *" or, "the advantage remaining after all costs, charges and expenses have been deducted from income." By these definitions, Marine did make a "net profit" on the sale of its original terminal. While there is an obvious distinction between "gross profits" and "net profits," the word "profit" is equivalent to "net profit." (See "Profit" at page 1376 of Black's Law Dictionary, Fourth Edition (1950)). We interpret the meaning of "net profits" in accord with the contracting parties' intention so as to reach an interpretation that is fair and reasonable considering "the relationship of the parties, the subject matter of the contract, the usages of the business, the surrounding facts and circumstances attending the execution of the contract and its interpretation by the parties." Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539[3] (1950). Here it is conceded Marine sold its original terminal in 1965 for $850,000 and thereby realized a gain of $720,190 over its costs of buying the terminal. Marine argues this was a "capital gain," and that term is "the creature of the internal revenue code and not a part of 'net profit,'" as that term is "used in our society.". This is a straw-man issue. Shorn of this hollow argument, the sale of Marine's terminal did beyond doubt produce a net profit of $720,190.

■ Of more substance, but no more merit, is Marine's contention its "net prof-

it" is limited to *operating* profit. Nowhere in the record is the phrase "net profit" either expressly or impliedly so limited. We hold the term "net profit" means the difference between Marine's income and its expenses, and that, *prima facie*, includes the gain on the sale of its terminal.

On the meaning of "net profits" used in an employment contract both plaintiff and Marine cite Harvey v. Missouri Valley Electric Co., 268 S.W.2d 820, 1.c. 821 (Mo.1954), holding "the meaning of 'net profits' and what is included therein varies according to the context in which, and the circumstances under which, the words are used . . . ."

On this issue Marine also cites *Sidney Smith,* supra. That case was decided on its own facts (as are all cases in this field of law), and the court pointed out that Steinberg had a contract for a fixed salary, plus one-third of the "net profits." But with reference to the elements constituting net profits, the contract said: "It is expressly understood that party of the second part [employee Steinberg] has no interest vested or contingent in the merchandise, equipment, tradesname or good will of said business, either during the term of this contract or after its termination." With that provision in the contract, the court necessarily held the gain from the sale of a customer's list was not intended to be included in the computation of net profits. Here there were no such limitations on plaintiff's share of Marine's profits. Unlike *Sidney Smith* plaintiff was an incorporator, officer and shareholder and participated in the corporate business leading up to the profitable sale. The opinion there does not help Marine.

Marine also cites the case of Smith v. Peninsula House, Inc., 65 N.J.Super. 341, 167 A.2d 807 (1961). The agreement there was that plaintiff was to be manager of defendant's hotel already in existence, and was to receive one-half of any "net profits." The hotel was sold but produced no gain. In addition to the hotel defendant-employer also sold at a profit another property, unrelated to the hotel the plaintiff was hired to manage. The case merely held that under the contract the plaintiff could not share in the gains from the other property. In contrast, the asset profitably sold here was the same asset plaintiff participated in buying, managing and selling. That case is readily distinguishable and does not help Marine.

Several contrasting factors in our case persuade us to find the parties evidenced no intention to limit "net profits" to operating profits. Purchase of the original terminal, its sale, the purchase of a site for a new one and the attendant financing, were integral parts of Marine's wholesale fuel business. Over the years plaintiff participated in these transactions even to the extent of personally guaranteeing loans. Marine used income from the sale of the original terminal in part to buy tow boats, purchase securities, finance the new terminal and to pay increased dividends to stockholders. All this contrasts sharply with *Smith,* supra, where the plaintiff-employee came into the defendant corporation, already established, to manage one hotel and the questioned profits arose from the sale of an unrelated property.

We find still another indication of the parties' lack of intent to limit plaintiff's income to a share of operating profits. In previous years the depreciation of Marine's physical assets was treated as a corporate expense in computing net profits. By so charging plaintiff's share of Marine's profits with the depreciation of physical assets a logical corollary would be that the parties intended plaintiff's income would be increased by *appreciation* when realized. This is a persuasive factor against Marine's contention plaintiff's compensation was to be limited to operating profits.

We hold the trial court did not err in determining the amount of plaintiff's judgment. Having previously determined plaintiff was entitled to a judgment on his Count IV and now finding the amount of

the judgment rendered was proper, it follows that part of the judgment must be affirmed.

### Plaintiff Sid Siteman's Appeal

Plaintiff's appeal is from the trial court's denial of his claim to salaries for fiscal years 1966–1970 following his dismissal, as pleaded in his Counts I, II, III and V.

First, we refer to our previous statement of facts concerning plaintiff's salary for fiscal year 1965–1966 for which the trial court granted him compensation. That finding was based on Marine's September 25, 1965 corporate minutes declaring plaintiff "be paid a salary to ten per cent of the net profits . . . said salary to be paid at the end of the fiscal year as soon as the net profits are determined . . . ."

Plaintiff's claim to the ten per cent salary for the ensuing fiscal years 1966–1970 after his dismissal is based on annual corporate minutes *before* 1965 declaring plaintiff was to be paid a ten per cent salary, not at the end of *the* fiscal year but at the end of *each* fiscal year. Plaintiff contends those earlier corporate minutes evidenced Marine's promise to pay him the ten per cent salary for as long as he was willing and able to serve Marine as general manager.

■ As said, the corporate minutes are not a contract but they are "prima facie evidence of what occurred at such meeting." Santa Fe Hills Golf & Country Club v. Safehi, supra. We conclude the unexplained words "each year" standing alone do not show a permanent contract. The proponent of a lifetime contract bears a heavy burden. In Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262 [12–13] (1940) the court said: " 'The courts are prone to hold against the theory that a contract confers a perpetuity of right or imposes a perpetuity of obligation. Yet it seems to be the law in this state that, where the intention to do this is unequivocally expressed, the contract will be upheld. (citing cases). But in this jurisdiction, as in others, courts will only construe a contract to impose an obligation in perpetuity when the language of the agreement compels that construction.' . * * * A contract for life will be upheld only where the intention, that the contract's duration is for life, is clearly expressed in unequivocal terms." (Emphasis added).

The evidence about the duration of plaintiff's employment by his pre-incorporation conversations with co-incorporators Phil Siteman and Myron Kopolow is of questionable binding effect on Marine but was considered by the trial court under Rule 73.01(a). Plaintiff testified the incorporators agreed his ten per cent salary was to be paid as long as Marine made a profit and as long as plaintiff was able to perform; but he qualified this by saying this was "implied" and an "equity position," and he recalled no specific conversations about the duration of his employment. Plaintiff's brother Phil Siteman could not recall that the duration of plaintiff's contract was discussed; his brother-in-law, Myron Kopolow, denied that duration was discussed.

We accept the trial court's finding that: "Under the testimony admitted in evidence in this case plaintiff simply did not adduce sufficient proof to make a prima facie case that he had an oral contract with defendant's promoters and prospective owners whereby plaintiff (as he pleaded) was to receive as salary a percentage of the net profits of Marine for a long time into the future or '. . . so long as, and if, plaintiff performed or stood ready to perform his covenants and undertakings . . . .' "

It follows that plaintiff did not prove the employment contract was to be permanent and we must affirm Marine's judgment against plaintiff on his Counts I, II, III and V.

Judgment affirmed.

McMILLIAN and GUNN, JJ., concur.

## ON MOTION TO SUBSTITUTE

In view of the death of Plaintiff-Appellant-Respondent Sid Siteman on June 21, 1974, it is ordered by the Court on motion of counsel for said Plaintiff-Appellant-Respondent that the names of Mignon K. Siteman, Linda Siteman Hyken and Herbert Wolkowitz, as Trustees under Indenture of Trust of Sid Siteman dated June 20, 1974, be and are substituted as Plaintiff-Appellant-Respondent in lieu of Sid Siteman, Deceased, and that said names be inserted in the caption by interlineation in lieu thereof.